##### IN THE

# Supreme Court of the State of Georgia,

## AT MILLEDGEVILE,

# NOVEMBER TERM, 1862.

---

PRESENT—JOSEPH H. LUMPKIN, ⎫
       RICHARD F. LYON, ⎬ JUDGES.
       CHARLES J. JENKINS, ⎭

---

ASA O. JEFFERS, plaintiff in error, *vs.* JOHN FAIR, enrolling officer, etc., defendant in error.

1. The Act of the Congress of the Confederate States of America, approved 16th April, 1862, entitled "An Act to further provide for the public defense," and the Act of the same Congress, approved 27th September, 1862, entitled "An Act to amend an Act, entitled An Act to further provide for the public defense," are constitutional.

*Habeas corpus*, from Baldwin county, decided by Judge IVERSON L. HARRIS, at Chambers.

A sufficient statement of this case will be found in the able opinion of the Court as pronounced by Mr. Justice JENKINS.

McKINLEY, for plaintiff in error.

A. H. KENAN and BLANDFORD, *contra.*

[(347)

Jeffers *vs.* Fair.

*By the Court.*—JENKINS, J., delivering the opinion.

The sole question presented by this record for the consideration of the Court, is the Constitutionality of two Acts passed by the Congress of the Confederate States; the one approved April 16th, 1862, entitled "An Act to further provide for the public defense;" the other approved September 27th, 1862, entitled "An Act to amend an Act entitled an Act to further provide for the public defense." From those Acts alone the defendant in error derives his authority to hold the plaintiff in custody, whilst the latter, admitting that he is within the purview, insists that they are unconstitutional, and the authority claimed under them void.

It is enough to say of those Acts, in this connection, that they authorize the President of the Confederate States to call out and to place in the military service of the Confederate States for three years, unless the war shall have sooner ended, all white men who are residents of the Confederate States, between certain ages, who are not legally exempt from military service.

The Court is impressed with the importance of the question, and the responsibility involved in its decision, have not failed to give it careful and anxious consideration.

The inquiry and course of argument pursued, bring under review the following clauses of the Constitution of the Confederate States. They are contained in the 8th section of the 1st article, and numbered as herein noted: The Congress shall have power: 12. To raise and support armies; but no appropriation of money to that use shall be for a longer term than two years; 15. To provide for the calling forth the militia to execute the laws of the Confederate States, to suppress insurrections and repel invasions; 16. To provide for organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the Confederate States, reserving to the States, respectively, the appointment of the officers and the authority of training the militia according to the discipline prescribed by Congress; 18. To make all laws which shall

Jeffers *vs.* Fair.

be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the Confederate States, or in any department thereof.

Before considering the extent and proper construction of the grant of *"power to raise armies"* contained in the 12th clause above recited, we must distinguish between it and the grant of *"power to call forth the militia,"* etc., contained in the 15th clause.

In the argument presented against the constitutionality of the Acts in question, we are called upon to construe these two clauses together as parts of the same grant. We regard them as wholly distinct. Armies raised under the 12th clause are instrumentalities whereby Congress executes the power to carry on war, whether offensive or defensive, whether on our own or foreign territory.

The individuals composing armies are separated from the mass of our population, and withdrawn from the ordinary civil pursuits during the time of their enlistment, whether in peace or in war. Armies are at all times and in all places, subject to the Government of the Confederate States; they are at no time and under no circumstances, subject to any State authority. The militia may be defined a body of citizens enrolled for military discipline. They are enrolled by State authority with reference to State boundaries; they are organized, officered and disciplined by State authority, the Confederate Congress having authority, (for the sake of uniformity) only to prescribe the mode of organization and discipline. They are not separated from the mass of their fellow-citizens, nor withdrawn from their ordinary pursuits, save occasionally for drill or for special and usually short service in the field. For such special service they may be called forth either by the authority of the State wherein they are enrolled, or by that of the Confederate States; but the power of the latter to call forth is limited to three special emergencies, viz: to execute the laws of the Confederate States, to suppress insurrections, to repel invasions. It is apparent, then, that they cannot be used in offensive war on foreign soil.

Armies raised under the 12th clause constitute the physical force, in conjunction with the navy, mainly relied upon for national defense, and exclusively for offensive, extra-territorial war in the assertion of national rights. The militia, when called forth, are citizen soldiery designed to be used in the special emergencies, at points where there may be no portion, or an inadequate portion of the regular army.

They are not intended at any time to be merged in any army of the Confederate States, nor to be substituted for it; but as a separate organization to come in aid of it. Doubtless the constitutional provisions relative to the militia, were adopted in furtherance of the American policy of maintaining small standing armies in times of peace.

But the grants of power "to raise armies" and "to call forth the militia" are entirely separate and distinct—are to be construed together for the purpose of restricting or enlarging either. Any such attempt must lead to the most embarrassing confusion, the necessity of avoiding which became apparent in the course of the argument submitted, and seemed to call imperatively for this preliminary distinction.

2nd. It is insisted "that the Confederate Congress has no power to raise armies by compulsion, but is wholly dependent for military forces upon *the voluntary enlistment* of men; and if it need more force than its armies thus raised and its navy, its only resource is to "call forth the militia of the States." It is clear under the view we have taken, that Congress can raise armies under the twelfth clause, only by voluntary enlistment or by compulsory enrollment, and we are now asked so to construe the grant as to limit them to the former mode. The limitation now considered is, as to *means* only; whether or not there be any other constitutional limitation of the power, we will hereafter consider. The acts of Congress under review, authorizes compulsory enrollment of citizens. The clause of the Constitution, in virtue of which the power thus exercised is claimed, is very general in its terms—neither specifying nor prohibiting any means.

Let the phraseology be fixed in the mind of the inquirer. The *Congress shall have power to raise armies, etc.* Language

could not express a broader, more general grant of a specific power.   We look in vain for the limitation to voluntary enlistment as a means.   Is there any difference between a grant of *"power to raise armies?"*   We think not.   Yet had the latter form of expression been used, who would have affirmed the existence of the limitation now insisted on?   We understand the rule of construction in such cases to be, that *"* an unqualified grant of power gives the means necessary to carry it into effect."   But the proposed limitation reduces the grant to *"a bare authority to raise armies by accepting"* *volunteers*. Now this idea and the idea of a power to raise armies, are widely different; and not less so are the terms appropriate to the expression of the one, and the other.   Presuming that the framer of the Constitution used the words employed in their ordinary unambiguous significance, we hold that the clause, *ex vi termini*, express a grant of *power*—of power commensurate with the object—of power over the populations of the several States, entering into and becoming component parts of the Confederate States of America.   Undoubtedly, voluntary enlistment as a means, would always be preferred, when efficacious, to compulsory enrollment, but in many cases, a limitation to the former would render the power barren.   So obvious is the necessity of compulsion to render the grant effective that those holding the position we combat admit that it may be resorted to, but only through the agency of the several States.

The admission places compulsory enrollment in the relation of incident to the power to raise armies.   But their view imputes to the framers of the Constitution this absurdity, viz: That having divested the States of the powers to declare war and to raise armies, and having vested those powers in the Confederate Congress, and knowing that the latter power would be incomplete without compulsory enrollment, they nevertheless left it exclusively in the hands of the States.   Let us resolve this logic into the form of a sylogism.   Compulsory enrollment is a proper incident of the power to raise armies; the Confederate Congress have, and the States severally have *not* the power to raise armies; *ergo,*

the Congress may *not*, but the several States *may* resort to compulsory enrollment.

3d. Again, if the grant contained in the twelfth clause (which we have thus far considered *per se*) fall short of authorizing the Congress to resort to compulsory enrollment, in execution of the power, surely the defect is supplied by the eighteenth and last clause, which applies equally to all the preceding clauses of the section. It confers "power to make all laws which shall be necessary and proper for carrying into effect the foregoing powers," etc. How does this comport with the idea, that should compulsion become necessary, in the process of raising armies, the Congress *must* appeal to the States to use it?

We have held that the power to raise armies is separate and distinct from the power to call forth the militia, and the only means to which Congress can resort in execution of the power, are voluntary enlistment and compulsory enrollment.

Conceding then, *for the argument*, that the latter is not authorized by the twelfth clause, we are constrained to hold that it is authorized by the eighteenth clause whenever voluntary enlistment shall fail, or cease to promise necessary results. We by no means concede that in a time of flagrant war the Congress would be constrained to wait until that resource had been wholly exhausted of success before resorting to the other means. Under such circumstances promptness is an indispensible element in raising armies. Delay would often amount to failure. That scheme which promises the greatest attainable promptness and efficiency is both necessary and proper. Of these the Congress must be the judges, because in them is vested the power, and upon them rests the responsibility of declaring war and raising armies to prosecute it. Those who would thus limit the power of Congress, seem to forget that voluntary enlistment is not mentioned as a means in the Constitution. Upon what then rests their limitation? Clearly on their own notions of fitness and propriety. And upon these points how variant are men's ideas! They are referable to no criterion, measurable by no standard. Something more weighty than vague abstrac-

Jeffers *vs.* Fair.

tions must be invoked to induce us to fetter the government in the exercise of a power, upon the vigor of which depends our national existence.

4th.   But it is further argued that the proceeding by which the plaintiff in error is held in custody, under whatever clause of the Constitution attempted to be justified, is virtually calling forth the militia, and violates the Constitution, in that it takes from the States the power of appointing officers of the militia so called forth.   This argument rests upon the fact that the men now being enrolled for service in the army, have been previously enrolled by the States as militia men. The simple and obvious reply is, that the status of the citizen is not merged in the militia-man ; that the fact of enrolment with the militia does not exempt him from other duties and liabilities of citizenship.   If it were so, and if the militia be so sacred a body that the Confederate Government cannot touch the individuals composing it, then would it be improper for that Government to seduce them from it by the offer of bounties and wages as an inducement to voluntary enlistment.   The consequence would be that in times like the present, when our access to foreign populations is cut off, the Government charged with the conduct of the war would find it impossible to raise armies, and the clause of the Constitution conferring that power would be a dead letter when most necessary to the " general welfare."

5th.   The points remaining to be considered are resolvable into this : that the power claimed is a violation of the spirit (if not the letter) of the Constitution, incompatible with State sovereignty, and subversive of the State Governments. Having, as we think, established the existence of an express grant of power claimed, we might well decline entering into so wide a field of inquiry as that thus opened.   The task would seem more appropriate to a body clothed with authority to make or to alter and amend the Constitution.

Yet as it has been pressed with great earnestness, and as under our peculiar institutions, it is desirable not only that the National Government should possess necessary powers, but that its possession of them should meet the sanction of

public opinion, we will consider this view. The objection rests upon this basis: that throughout the Constitution there is manifested an intention to transfer from the States, previously invested with all political powers, to the Confederate Government, only such of them as are necessary to the attainment of the end for which it was established, leaving the *residuum* unimpaired with the States. The intention and its rectitude we fully recognize. We accept it as a governing principle with the Convention that framed, and the several sovereign peoples that adopted it. For the ascertainment of their intention regarding the power in question (" to raise armies ") we propose a candid application to the end in view of this cardinal principle in the circumstances surrounding them. It is eminently proper to state, first, the end proposed to be accomplished by the adoption of the Constitution. A careful perusal of the instrument cannot fail to impress upon the mind of the inquirer the significant fact that in the distribution of powers between the States and Confederate Government, the regulation of *internal affairs is left with the* former, whilst the external relations of all are committed to the latter. From this we deduce two inferences—first, that the former were deemed fully competent to regulate the civil conduct of individuals, and to promote their domestic prosperity in the aggregate, and, therefore, all power necessary to those purposes remained with them. Secondly, that they were incompetent severally to manage successfully the vast machinery of international relations, and, therefore, for this purpose, a common agent was constituted for them, and invested with necessary powers. The controlling inducement then was the better and safer conduct of foreign relations— the great end aimed at, the embodiment of such strength as would deter encroachment, repel invasions and defend right in those relations. Our Constitution (with a few exceptions not affecting this investigation) is a liberal copy of the Constitution of the United States, under which our States, until recently, confederated with others. The experience which induced its adoption was our experience.

Whatever light, therefore, may be derived from American

history, and whatever authority from eminent actors in the political arena, between the declaration of independence and our secession from the Union, are legitimate aids in the further prosecution of our inquiry.  The Constitution of the United States had been preceded by articles of confederation among the States, being their first experiment in a bond of union.  It had been tried in war and in peace, and had been found defective.  Prominent among the defects thus developed was a want of power in the general Government to raise revenue and to raise armies.  The general Congress had authority " to defray charges of war and other expenses, out of a common treasury;" but that treasury " was to be supplied by the several States—the taxes for that purpose to be laid by their several Legislatures."  It had authority only to agree upon the number of land forces, and " to make make requisition upon each State for its quota."  Our forefathers learned from experience, gathered in the revolutionary war, that requisitions upon the States for their several quotas of land forces were not met with equal promptness.  The State most remote from the seat of war, and least affected by its ravages, responded tardily or not at all.

Similar difficulties and delays occurred in raising revenue. Hence, resulted two serious consequences—the full number of forces agreed upon by Congress, as necessary for defense, was never supplied, and the burthen of actual supply of men and means pressed unequally upon the States.  It will be conceded that in furnishing her quota of men, each State had the power of compulsory enrollment, and in furnishing her quota of money, the power of compelling the payment of taxes. But the defect in the system was, that the power of making war was vested in the general Congress, whilst the power of raising revenue and armies remained with the States.  The Congress could neither act directly upon individual citizens nor compel the States to do so.  It was to remedy these defects in the old system that the framers of the Federal Constitution proposed to give such ample power, touching armies and revenue to the new Government.  The first testimony we adduce of the defects in the articles of confederation and

Jeffers *vs.* Fair.

the appropriate remedy shall be from the father of his country. General Washington, whose position as commander-in-chief of the revolutionary army, gave him a clearer view of these defects than contemporary could possibly have, writes thus, in 1781, in the midst of that war, to John Parke Curtis, his friend and relative, then a Senator in the Legislature of Virginia:

. After insisting upon the "necessity of having a permanent force" instead of "temporary enlistments and a reliance upon the militia," he continues: "It must be a settled plan, founded upon system, order and economy, that is to carry us triumphantly through this war. Supineness and indifference to the distresses and cries of a sister State, where danger is far off, and a general but a momentary resort to arms, when it comes to our doors, are equally impolitic and dangerous, *and prove the necessity of a controlling power in Congress to regulate and direct all matters of general concern. The great business of war can never be well conducted, if it can be conducted at all, while the powers of Congress are only recommendatory; while one State yields obedience and another refuses it, while a third mutilates and adopts the measure in part only, and all vary in time and manner, it seems hardly possible that our affairs should prosper, or that anything but disappointment can follow the best concerted plans.* The willing States are almost ruined by their exertions; distrust and jealousy ensue. Hence proceed neglect, and illtimed compliances, one State waiting to see what another will do. This thwarts all our measures after a heavy though ineffectual expense is incurred.

"Do not these things show, in the most striking point of view, the indispensable necessity, the great and good policy of each State's sending its ablest and best men to Congress; men who have a perfect understanding of the Constitution of their country, of its policy and interests, *and of vesting that body with competent powers.*

" *Our independence, our respectability, and consequence in Europe, our greatness as a nation hereafter depend upon it. The fear of giving sufficient powers to Congress, for the pur-*

pose I have mentioned, is futile.  A nominal head, which at present is but another name for Congress, will no longer do. That honorable body, after hearing the interest and views of the several States fairly discussed and explained by their respective representatives, *must dictate, and not merely recommend* and leave it to the States afterwards, to do as they please, which, as I have observed before, is in many cases to do nothing at all," (7 Spark's Writings of Washington, 442-3-4.)  We submit whether anything short of the Constitution as it now is, and as we construe it, would meet the views of Washington, as here expressed.  Whilst the adoption of the Constitution by the people of the States was an open question, its opponents insisted that those provisions were inimical to the liberty of the citizen, and that they would render the General Government too strong, and the State Government too feeble.  Its advocates drew their replies from their then recent experience in peace and in war.  In the State Conventions assembled, to consider and adopt or reject the Constitution, and through the medium of the press, these conflicting opinions were urged with unrestricted freedom, and with the unsurpassed ability evinced by the statesmen of that day.  In those discussions, the concentrated lights of history and of reason were brought to the aid of a pure and elevated patriotism.  We quote, in this connection, from the arguments of distinguished advocates of this power, partly because their opinions are of themselves high authority, but chiefly, because those opinions having prevailed, we are justified in assuming that their reasoning was accepted, in the adoption of the Constitution, and in treating it as an index of intention.  In the Virginia Convention, Mr. Madison said :  " The power of raising and supporting armies, is exclaimed against, as dangerous and unnecessary. I wish there was no necessity of vesting this power in the General Government.  But suppose a foreign nation to declare war against the United States, must not the general Legislature have the power of defending the United States ? If, sir, Congress be not vested with this power, any powerful nation, prompted by ambition or avarice, will be invited by

Jeffers *vs.* Fair.

our weakness to attack us ; and such an attack, by disciplined veterans, would certainly be attended with success, when only opposed by irregular undisciplined militia. Whoever considers the peculiar situation of this country, the multiplicity of its excellent inlets and harbors, and the uncommon facility of attacking it, however much he may regret the necessity of such a power, cannot hesitate a moment in granting it." He then shows that the lack of power during the revolutionary war, had driven the Government to purchase foreign aid by a cession of territory, and concludes : "This fact shows the extremities to which nations will go in cases of imminent danger, and demonstrates the necessity of making ourselves more respectable. The necessity of making dangerous cessions and of applying to foreign aid ought to be excluded." (3 Elliot's Debates, 112.) No candid mind will imagine that Mr. Madison was here offering the necessity, whilst he deprecated it, of conferring on the General Government a simple authority *to accept volunteers* for national defense, in a moment of pressing danger. Mr. John Marshall, (afterwards Chief Justice of the United States) in the progress of the same debates, speaking of the powers to raise revenue and to raise armies, says : "What are the objects of the national Government ? To protect the United States, and promote the general welfare. Protection in time of war, is one of its principal objects. Until mankind shall cease to have ambition and avarice wars will arise.

" The prosperity and happiness of the people defend upon the performance of these great and important duties of the General Government. Can these duties be performed by one State ? Can one State ·protect us and promote our happiness ? How then can these things be done ? By the National Government only. Shall we refuse to it power to do them ? We are answered that the power may be abused ; that though the Congress may promote our happiness, yet they may prostitute their. powers to destroy our liberties. This goes to the destruction of all confidence in agents. Would you believe that men who had merited your highest confidence would deceive you ? Would you trust them after

Jeffers *vs.* Fair.

one deception? Why hesitate to trust the General Government? The object of our inquiry is, *is the power necessary, and is it guarded?* There must be men and money to protect us. How are armies to be raised? Must we not have money for that purpose? * * It is necessary then to give the Government that power in time of peace which the necessity of war will render indispensable, or else we shall be attacked unprepared. * * * The propriety of giving this power will be proved by the history of the world, and particularly of modern republics. I defy you to produce a single instance where requisitions of several individual States, composing a confederacy have been honestly complied with.

"Did gentlemen expect to see such punctuality complied with in America? We are told that the confederation carried us through the war. Had not the enthusiasm of liberty inspired us with unanimity, that system would never have carried us through it. It would have been much sooner terminated had the Government been possessed of due energy. The inability of Congress, and the failure of the States to comply with the Constitutional requisitions, rendered our resistance less efficient than it might have been. * * If requisitions will not avail, the Government must have the sinews of war some other way. Requisitions cannot be effectual. They will be productive of delay, and will ultimately be ineffectual." (3 Elliot's Debates, 226.) Again, speaking of the danger of foreign aggression, he said "he would give the General Government all necessary powers. If anything be necessary, it must be so to call forth the strength of the Union when we may be attacked, or when the general purposes of America may require it." (3 Elliot's Debates, 233.)

In the New York Convention, Mr. Hamilton (who was also a member of the Federal Convention) said: "We contend that the radical vice in the old confederation is, that laws of the Union apply only to States in their corporate capacity. Has not every man who has been in our Legislature experienced the truth of this position? It is inseparable from the depositions of bodies who have a constitutional power of resistance, to examine the merits of a law. In this exami-

nation, not being furnished with those lights which directed the deliberations of the General Government, and incapable of embracing the general interests of the Union, the States have almost uniformly weighed the requisitions by their own local interests, and have only executed them so far as answered their particular convenience and advantage. Hence there have been thirteen different bodies to judge the measures of Congress, and the operations of Government have been distracted by their taking different courses. Those which were to be benefitted have complied with the requisition, others have totally disregarded them. Have not all of us been witnesses of the unhappy embarrassments which resulted from these proceedings? Then, after some details, showing that two States only "had perfectly discharged their federal duty," "that two others had been totally delinquent," and the remaining nine partially so, he continues: "What, sir, is the cure for this great evil? *Nothing, but to enable the national laws to operate on individuals in the same manner as those of the States do.* This is the true reasoning upon the subject, sir. The gentlemen appear to acknowledge its force; yet while they yield to the principle, they seem to fear its application to the Government." (2 Elliot's Debates, 231–3.) Those who will take the trouble to read this speech will perceive the speaker did not refer exclusively to requisitions either for men or for money, but to the whole subject of requisitions upon which the Congress of the Confederation were dependent for both. His reasoning is alike applicable to each. Indeed, it must be so in the nature of things. The same motives which would induce neglect of or compliance with, on description of requisitions, would lead to a like result with regard to the other. In the Connecticut Convention, Mr. Elsworth, having enforced, by historical examples, the necessity in confederated sovereignties of coercive power in the Federal Government, continues: "But to come nearer home, Mr. President, have we not seen and felt the necessity of such a coercive power? What was the consequence of the want of it during the late war, particularly towards the close? A few States bore the burden of the war. While

we and one or two more of the States were paying eighty or a hundred dollars per man to recruit the Continental army, the regiments of some States had scarcely men enough to wait on their officers.   *   *   *   But I do not wish to continue the painful recital ; enough has been said to show that a power in the General Government to enforce the decrees of the Union is absolutely necessary.   The Constitution before us is a complete system of legislative, judicial and executive power.   It was designed to supply the defects of the former system, and I believe, upon a full discussion, it will be found calculated to answer the purposes for which it was designed." (2 Elliot's Debates, 191-3.)

In the Convention of South Carolina, Mr. Pinckney, (a delegate in the Federal Convention,) upon the general subject of the nature of the power proper to be confided to the General Government, said:   "He repeated that the necessity of having a Government which should operate upon the people and not upon the States was conceived to be indispensible by every delegation present, (in the Federal Convention,) that however they may have differed with respect to the *quantum* of power, no objection was made to the system itself."   (4 Elliot's Debates, 251.)

And in the same argument, reviewing the different powers, to all of which the foregoing remark is applicable, he continues :   " As to the further power of raising troops, it was unnecessary to remark upon it, further than to say that this is a power the Government at present possesses and exercises, a power so essential, that he should very much doubt the good sense or information of the man, who should deem it improper—it is guarded by a declaration, that no grants for the purpose shall be longer than two years at a time."   (Ibid. 255.)   It is obvious that Mr. Pinckney must be understood, as saying, that the power of raising raising armies was essential to the Government, and that in the exercise of it, as well as of other powers, it was necessary that the Government, *" should operate upon the people, and not upon the States."*   These quotations might be multiplied, but we deem these sufficient to present clearly, the reasoning upon which,

and the objects to attain which, the people were urged to adopt the Constitution. Did it comport with limits appropriate to this paper, we might fortify our position by large quotations from adverse views presented in the same Conventions, by reason of the fact that the adverse arguments and counsels, however able, eloquent and earnest, were rejected, in the act of adoption. To the foregoing we will add a few facts from the *Federalist*, a publication in 1788, by Madison, Hamilton and Jay, urging upon the people of the United States the adoption of the Federal Constitution.

In the fifteenth number, page 67-70, Mr. Hamilton reiterates the view presented by him in the New York Convention, and in number twenty-six, page 116, he remarks: "The idea of restraining the legislative authority in the *means* for providing for the national defense, is one of those refinements, which owe their origin to a zeal for liberty, more ardent than enlightened. We have seen, however, that it has not had thus far an extensive prevalence; that even in this country, where it made its first appearance, Pennsylvania and North Carolina are the only two States by which it has been in any degree patronized; and that all the others refused to give it the least countenance."

Mr. Madison, commenting on the same defects of the Confederation, reviews the construction and epitomizes the history of several similar systems; the Amphyctionic Council—the Athæan League and the Germanic Empire. After enumerating the powers vested in the Germanic Diet, he says: "From such a parade of constitutional powers in the representatives and head of this Confederacy, the natural supposition would be, that it must form an exception to the general character which belongs to its kindred systems. Nothing would be further from the reality. The fundamental principles upon which it rests, that the Empire is a community of sovereigns; that the Diet is a representation of sovereigns, and that the laws are addressed to sovereigns, render the Empire a nerveless body, incapable of regulating its own members, insecure against external dangers, and agitated with unceasing fermentation in its own bowels." (Fed. No. 19, page 85.)

Jeffers *vs.* Fair.

Again, in concluding the historical summary, he says : " I make no apology for having dwelt so long on the contemplation of these Federal precedents.    Experience is the oracle of the truth, and where its responses are unequivocal, they ought to be conclusive and sacred.    The important truth, which it unequivocally pronounces in the present case, is legislation for communities, as contradistinguished from individuals, as it is a solecism in theory, so in practice, it is subversive of the order and ends of civil polity by substituting violence in the place of law or the destructive coercion of the sword in the place of the mild and salutary coercion of the magesticy." (Fed. No. 20, page 92.)

The substance of the lesson thus inculcated by these sages is, that in the exercise of the powers to raise revenue and to raise armies for the protection of the country, the Federal arm should be lengthened and strengthened as to enable the Government to reach individuals, instead of registering edicts to be enforced upon them by the States, *if in their sovereign discretion they should choose to do so.*    Since then, with these objections urged upon the one hand and answered on the other, with all possible clearness and force, the people of the several States adopted the Constitution, what is the just conclusion as to their intention regarding the clauses under consideration ?    Clearly it would seem to transfer the entire powers to raise revenue and to raise armies for the use of the General Government from the States to that Government, to place them side by side with the war-making power.    But to make the transfer complete it was necessary that it should embrace touching revenue, the power to enforce payment, and touching armies, that of compulsory enrollment.

Armies it is said may be raised by voluntary enlistment, so revenue may be collected by voluntary payment; yet all concede that the intention was, to grant the power of enforceing payment.    Then why not *pari passu* with it, that of compulsory enrollment.    The grants are both expressed in general comprehensive terms inseparable ; the Government bereft of either, cannot possibly make the other available. Then why subject them to the different rules of construction?

The people of the Confederate States, when they came to perform a similar act, had received additional historical enlightenment. They learned from the history of the intervening period, that during the last war with England, there had been convened at Hartford a Convention with a view to the organized opposition of several States to a war in actual progress—that the Governors of several of those States had boldly denied the power of the Federal Government to call their militia beyond their respective boundaries. They were thus taught that refractory Governors and recusant States, were to say the least *possibilities*. They might readily infer that States which could not be relied upon for militia service, were scarcely reliable for army requisitions.

It thus appears that, with the same end in view, guided by the same, and additional historical lights, and prompted by the further consideration that, in the very hour of their action, the cloud of terrible war hung portentiously over them, the people of the Confederate States adopted, *quoad* these powers, the same Constitution. Our conclusion is, that the power of raising armies by compulsory enrollment, was necessary to the attainment of the end, that it was seen by them to be so ; that they intended by the terms used to grant it, and consequently that it is no violation of the spirit of the Constitution.

That the grant of this power in the plenitude claimed by the Congress, and conceded by this Court, "is incompatible with original unabridged State sovereignty, is a self-evident truth, for it is a very high political power."

But we are precluded this test by the Act of the States partitioning between themselves and the Confederate Government the powers which, aggregated, make absolute sovereignty. The true test is, whether it be the exercise of a delegated or an usurpation of a reserved power. We hold that it is the former, and therefore compatible with the large residuum of sovereignty which the States intended to retain. If the true construction of the Constitution be, that in deference to State sovereignty the Confederate Government must depend upon the separate, unconcerted action of the several

States for the exercise of powers granted to it in general comprehensive terms, it is but the shadow of a government, the experiment of Confederated Republics must inevitably fail, and the sooner it is abandoned the better.

The alternative then remaining to the advocates of Republican Government will be either the separate nationality of the States, each facing the great powers of earth in its pitiable imbecility, or the obliteration of State lines and the formation of a consolidated republic.

It is believed, however, that construing the Constitution by a just and intelligent discrimination, unbiased by jealous fears on either hand, the existing happy mean, may be made to work safely and beneficently.    Nevertheless, if it be true that the exercise of this power, as we construe it, *" would be subversive of the State Governments or might be made so,"* then indeed, is it violative of the spirit of the Constitution.    That such is its character, say its opponents, is apparent from the following view:  " If the Congress have the power to enroll and force into the army the citizens of the States, they may enroll their Governors, Legislators, Judges and Ministerial officers, and thus annihilate civil government within their borders."    It seems not to have occurred to the objectors, who conceding that the power, as an incident to that of raising armies, must *ex necessitate rei,* exist somewhere, claim it for the States, that they might enroll the corresponding officials of the Confederate Government, and thus, in the midst of war, annihilate the agency charged with its prosecution.    Should it be said that this suggestion is the offspring either of an excited imagination, or of a distrustful hypercriticism, we must allow the justice of the impeachment.    But then, how shall the first escape the like condemnation, seeing that the two exhibit plain traits of a common lineage ?    The earnestness with which this objection has been pressed, and the countenance given it in high quarters, must be our apology for bestowing upon it graver and more extended notice.

6th.  We have said that the " power to raise armies " is unlimited *as to the use of means;* we have not said, it is unlimited *as to the subjects upon whom it may operate.*    There are

Jeffers *vs.* Fair.

certain first principles which underlie all governments and all organized society, the violation of which the framers of governments are not supposed to intend, and the attempted violation of which will always be arrested. Says Burlamague, the great expounder of national and civil law : " We must not confound an absolute power with an arbitrary, despotic and unlimited authority. For from what we have now said concerning the origin and nature of absolute sovereignty, it manifestly follows, that it is limited, from its very nature, by the intention of those who conferred it." The Government of the Confederate States was formed by the sovereign people of the respective States, for specific, well defined purposes ; but they retained for other purposes, equally well defined, their several pre-existing governments, to enable it to accomplish one of the purposes for which it was instituted. We say they granted it unlimited power in the use of means to raise armies from their populations. But if ever that Government shall apply to those means to the enrollment of the officers and agents, by whom the State Governments are operated, and without whose agency their machinery must stop, it will manifestly transcend its limit by violating the intention of those who conferred the power." We quote also to the same effect, Professor Rutherford. In his Institutes of National Law, after explaining how despotic governments are produced, he proceeds : " In all these cases the same body which prescribes what is to be done, having the public force in its hands to compel the execution of it, is subject to no constitutional checks or controls ; it is possessed of the whole power of government, and consequently is as absolute as it is possible for civil power to be. I say as it is possible for civil power to be, because civil power, when it is vested anywhere, unless in the collective body of the society, however absolute it may be in some respects, is not so in all. We call it absolute where the Constitution has provided no constant and uniform control of it, that is, we call it absolute when it is so in respect of any constitutional restraint. But still as it is only civil power, it will be limited by its own nature ; for as this is a power formed for certain purposes, it

Jeffers *vs.* Fair.

cannot in its own nature be so far absolute as to be free either to promote those purposes or to prevent them." (2 Rutherford, 99, 397.)

The preamble of the Constitution recites that "the people of the Confederate States, each State acting in its sovereign and independent character, in order to form a permanent federal government, *establish justice,* insure domestic tranquility, and secure the blessings of liberty, * * * do ordain and establish this Constitution," etc.

Now, it is apparent that whenever the Government thus established shall use a power granted to it, so as to annihilate, suspend or obstruct the State governments, and charged with the administration of internal domestic polity, with "establishing justice" between man and man, it will "prevent the purposes for which it was established," and so exceed its limits. Sir William Blackstone affirms that the law of nature is superior to civil power, and that "no human laws are of any validity if contrary to it." (1st Blacks. Com., 41.) Vatel says: "The law of nations limits the civil power." (Vatel's L. N., preliminary sec. 9, page 51.)

We learn from these commentators (of acknowledged authority) that civil power, even in despotic governments, is held in and restrained within limits by great first principles, or by limitations inherent in each peculiar system. Were there no more certain or definite security in our case we might conclude that a government administered by agents, chosen at short intervals by the people of the several States, and therefore responsible to them, would respect these universally recognized limits of even irresponsible power. But there are in the Constitution itself, express limitations concerning this point. The sixth clause of the 6th Article is in these words: "*The power not delegated to the Confederate States by the Constitution, nor prohibited by it, to the States, are reserved to the States respectively, or to the people thereof.*"

As a general grant of power includes the means necessary to its exercise, so a general reservation of power includes its necessary instrumentalities. As no interference of State authority, with the exercise of granted powers, should be

permitted, so no suspension or obstruction by Confederate authorities of reserved powers should be permitted.

Without descending to particulars, we remark that, that whole class of powers not delegated to the Confederate States (and it is a large one) requires governmental functions which were previously in full exercise. Any interference of these would violate this clause. Again, the fourth clause, third section, fourth article, reads thus: "*The Confederate States shall guaranty to every State that now is, or hereafter may become, a member of this Confederacy, a republican form of government,*" etc. Can a republican form of government be maintained without the necessary instrumentalities? If, by any act of the Confederate Government, such instrumentalities, whilst in the exercise of their proper functions, within any State, were forcibly withdrawn, would not that act violate the constitutional guaranty?

In the populations of the States there is ample scope and verge for the exercise of the power in question without invading the departments of the State Governments. So far the Congress have recognized the limit here pointed out, by an act of exemption directory of their enrolling officers. We have said that they may be safely trusted for its observance, and we now add, that in our opinion, if ever regardless of it, the judicial interposition sought and refused in this case might properly be invoked. Our conclusion, then, is, that as to the use of means the power is unlimited, but clearly limited so as to exempt the civil officers of the several States.

Such is the construction we give to the Constitution, and we now cite, in addition to those previously cited on particular points, high authorities, which seem to us to cover the whole ground. Judge Story, who by his judicial opinions, and by his voluminous commentaries on the law, has established a wide and exalted reputation as a jurist, and whose clear legal vision was never jaundiced by political aspirations or party associations, has treated this subject fully, both in its historical and political relations. We commend to the impartial inquirer his entire commentary on the clause in question, from section 1173 to 1187 inclusive, commencing

on page 64 of the 3d volume of his Commentaries on the Constitution of the United States. Our quotations must necessarily be limited. In section 1174, page 64, volume 3, he remarks: "The power to raise armies is an indispensible to the power to declare war, and the latter would be literally *brutum fulmen* without the former, a means of mischief without a power of defence. Under the Confederation, Congress possessed no power whatever to raise armies, but only "to agree upon the number of land forces, and to make requisitions from each State for its quota," etc. It will be observed that the learned commentator considers the grant under the old Confederation "*no power whatever to raise armies.*" But if the present Constitution does not give the power to coerce individuals, it will be exceedingly difficult to appreciate the gain of power. After giving a summary of the arguments adduced for and against the power, whilst the Constitution was before the people of the States for their adoption or rejection, he adds, (section 1178 inclusive,) "*Indeed, in regard to times of war, it seems utterly preposterous to impose any limitation upon the power,* since it is obvious that emergencies may arise which would require *the most various and independent exercise of it.* The country would otherwise be in danger of losing both its liberty and its sovereignty from its dread of investing the public councils with the power of defending it. It would be more willing to submit to foreign conquest than to domestic rule. But in times of peace the power may at last be equally important, though not so often required to be put in full exercise." In 1841 Mr. Monroe, then Secretary of the War Department, presented to the Congress a plan for the increase of the army, involving compulsory enrollment. For this plan see 7 Niles Weekly Register, 294. Whilst his plan was under consideration, Mr. Monroe addressed to the Chairman of the Committee on Military Affairs a letter, from which we extract as follows: "The idea that the United States cannot raise a regular army in any other mode than by accepting the voluntary service of individuals is believed to be repugnant to the uniform construction of all grants of power, and equally so

to the first principles and leading objects of the federal compact. An unqualified grant of power gives the means necessary to carry it into effect. This is an unusual maxim which admits of no exception. Equally true is it that the conservation of the State is a duty paramount to all others. The commonwealth has a right to the service of all its citizens, or rather the citizens composing the commonwealth have a right collectively and individually to the service of each other to repel any danger which may be menaced. The manner in which the service is to be apportioned among the citizens, and rendered by them, are objects of legislation. All that is to be dreaded in such case is the abuse of power, and happily our Constitution has provided ample security against that evil. The limited power which the United States have in organizing the militia may be urged as·an argument against their right to raise regular troops in the mode proposed. If any argument could be drawn from that circumstance, I would suppose that it would be in favor of an opposite conclusion. The power of the United States over the militia has been limited, and for raising regular armies granted without limitation. There was, doubtless, some object in this arrangement. The fair inference seems to be, that it was made one great consideration, that the limitation in the first instance was intentional, the consequence of the unqualified grant of the second. (7 Niles' W. R., 138–9.)

George M. Troup, of Georgia, a man "without fear and without reproach," a profound statesman, an early, consistent and unrelenting advocate of State rights, whom the people of Georgia, at least, always delighted to honor, and felt safe in following, was then chairman of that committee. As chairman, he reported a bill for the increase of the army, based upon Mr. Monroe's recommendation, and supported by an argument from which we extract the following: "But is there no mode to which you can resort for filling the ranks but voluntary enlistment; I would be extremely sorry if we could not. I have always thought this Government, *when administered in the true spirit of the Constitution*, the strongest Government in the world, even for the purposes of war; but

Jeffers *vs.* Fair.

if the doctrine set up of late be true, this is the weakest and most contemptible Government on earth ; it is neither fit for war or peace, it has failed of all the ends for which governments are established. It cannot be true that this Government, charged with the *general defense, authorized to declare war and to raise armies, can have but one mode of raising armies,* whilst every other government that has ever existed *has had an absolute power over the population of the country for this purpose, and has actually exercised it.* But this question is not properly before the House, and I will not go into an argument to show that you can, like other governments, resort to other modes of raising armies than that of voluntary enlistment ; that you can resort to classification and draft, to classification and penalty, or any other mode which a sound discretion may, in a particular state of the country, dictate and justify. All I intend to say at the present is, that you have an absolute power over the population of the country for this purpose, and that in the present state of the country it is wiser to resort to classification and draft than to resort to the bill from the Senate; *the one will give the men certainly expeditiously ; the other will not.*" (7 Niles' Weekly Register, 79.)

Thus sustained by cotemporary and subsequent expositions of the Constitution, we rest upon our conclusions undisturbed by any lingering doubt. And it is a high gratification, that in the crisis of our fate as a nation, when flagitious war is desolating our country, we are enabled, in perfect consistency with the obligations of official duty, to " stay up the hands " of our Confederate authorities in the wise and timely exercise of a power expressly granted.

We therefore unanimously adjudge that the judgment of the Court below be affirmed.

Let the judgment be affirmed.