## In the Matter of Jacob Spangler.

One Spangler was returned by the proper officer as liable to military duty. For the purposes of a draft ,the names of those thus returned were written upon ballots and placed in a box to be drawn from. By mistake in writing Spangler's name the final letter was omitted, but it was held that this error did not invalidate the draft.

Officers who, though appointed by the Governor of the State, are proceeding under a law of Congress to make a draft ordered by the War Department, are exercising a national authority, and persons drafted by them and held as drafted men, are held under national and not under state authority, notwithstanding they are not yet mustered into the United States service.

Where one is imprisoned under the authority and in right of the Federal Government, the State Judiciary has no jurisdiction to inquire into the legality of the imprisonment on *habeas corpus.*

*Heard April 28th and 29th. Decided May 12th.*

Habeas Corpus, directed to Randolph Strickland, Draft Commissioner for the county of Clinton. From the return and the admissions of the parties the following facts were made to appear, upon which the relator moved this Court for his discharge.

On August 9th, 1862, the Adjutant General of the United States issued General Orders No. 99, as follows:

"Regulations for the enrollment and draft of three hundred thousand militia.

In pursuance of an order by the President of the United States, bearing date August 4th, 1862, whereby it is provided that a draft of three hundred thousand militia be immediately called into the service of the United States to serve for nine months, unless sooner discharged, and that the Secretary of War shall assign the quotas to the States, and establish regulations for the draft; also that if any state shall not by the 15th of August furnish its quota of the additional three hundred thousand volunteers authorized by law, the deficiency of volunteers for that state shall also be made up by special draft from the militia, and that the Secretary of War shall establish regulations for this purpose,—

IT IS ORDERED: *First*, The Governors of the respective States will proceed forthwith to furnish their respective quotas of three hundred thousand militia called for by the order of the President, dated the 4th day of August, 1862, which quotas have been furnished to the Governors respectively by communication from this department of this date, according to the regulations hereinafter set forth.

"*Second*, The Governors of the respective States are hereby requested forthwith to designate rendezvous for the drafted militia of said States, and to appoint commandants therefor, and to notify the Secretary of War of the location of such rendezvous and the names of the commandants.

"*Third*, The Governors of the respective States will cause an enrollment to be made forthwith by the assessors of the several counties, or by any other officers to be appointed by such Governors, of all able bodied male citizens between the ages of eighteen and forty-five, within the respective counties, giving the name, age and occupation of each, together with remarks showing whether he

is in the service of the United States, and in what capacity, and any other facts which may determine his exemption from military duty. All reasonable and proper expenses of such enrollment, and of the draft hereby provided, will be reimbursed by the United States upon vouchers showing the detailed statement of service performed and expenses incurred, to be approved by such Governors.

"*Fourth*, Where no provision is made by law in any State for carrying into effect the draft hereby ordered, or where such provisions are in any manner defective, such draft shall be conducted as follows:

"1. Immediately upon completion of the enrollment the lists of enrolled persons shall be filed in the offices of the sheriffs of the counties in which such enrolled persons reside.

"2. The Governors of the respective States shall appoint a Commissioner for each county of their respective States, whose duty it shall be to superintend the drafting, and hear and determine the excuses of persons claiming to be exempt from military duty."

Then follows specific directions for the discharge of their respective duties by the enrolling officers and the draft commissioners, and for the service of notice upon the persons drafted to appear at the places of rendezvous. And also a direction for an additional draft to fill up the quota of any State of the additional three hundred thousand volunteers which should not be filled by the 15th day of August.

On the receipt of this order by Governor Blair, he issued a proclamation of which the following are the material portions:

"STATE OF MICHIGAN.

EXECUTIVE OFFICE, }
LANSING, August 25, 1862. }

"In accordance with the laws of Congress and orders from the War Department, to make a draft from the

militia of this State to meet the exigencies of the present rebellion, it is hereby ordered that the Assessors in each and every organized township in every county, and in each ward of every city in this State, be, and are hereby directed to make and complete a census of the male citizens between the ages of eighteen and forty-five, in their respective townships or wards, according to the printed forms furnished for that purpose, and to make a return of the same to the County Clerk of their respective counties on or before the 10th day of September, A. D. 1862.

"Commissioners will be appointed by the Governor in each county, whose duty it shall be to superintend drafting and hear and determine the excuses of persons claiming to be. exempt from military duty, and authority will be given to such Commissioners to superintend the making of such census and returns, and to see in all cases that full and complete returns are made.

"The necessary blanks will be sent to the several County Clerks by the Adjutant-General of the State, and it is hereby made the duty of the County Clerks of the respective counties to furnish the same to each and every Assessor in every township, or ward of any city, in his county, without delay.

"The County Clerks of the respective counties are hereby required to notify the Commissioner appointed to superintend drafting of the filing of the returns of the Assessors.

"Any Assessor or County Clerk guilty of a violation of, or neglect to perform, the duties enjoined in the making of such census and return, and the filing thereof, will be punished with the utmost rigor of the law."

Accompanying this proclamation was an order from the Adjutant General of the State, giving full directions to the assessors for the discharge of their duties under it.

On October 3d, 1862, the Adjutant General of the

State issued another order, specifying what counties were deficient in filling their respective quotas of the 300,000 additional volunteers, and allowing twenty days for filling the same before draft. By another order of the same date Draft Commissioners were appointed in the respective, counties, the respondent being so appointed for the county of Clinton. These Commissioners were to superintend the draft, and to hear and determine the excuses of those claiming to be exempt from military duty.

On January 29th, 1863, the Adjutant General of the State issued another order, providing that

"In carrying the draft into effect in the several counties,. the Commissioners and Sheriffs will be governed by the following instructions:

"At the time fixed by the Commissioner for making the draft, the Sheriff of the county, or, in his absence, such person as the Commissioner may appoint, shall, in the presence of said Commissioner, publicly place in a wheel or box, of a like character to such as are used for drawing jurors, separate folded ballots, containing the names of all persons remaining on said enrollment lists not stricken off by exemption, and a proper person, appointed by the Commissioner, and blindfolded, shall thereupon draw from said box or wheel a number of ballots, equal to the number of men to be drafted as the proper quota of each township or ward, after deducting the credits.

"A printed or written notice of his enrollment and draft, and of the place of rendezvous of the drafted military force, shall thereupon be served by the Sheriff of the county, upon each person so drafted, either by delivering the same in person or by leaving it at his last known place of residence.

"Any person so drafted may offer a substitute at the time of his arrival at the rendezvous of the drafted militia force, at the county seat, and such substitute, if he shall be an able-bodied man, between the ages of eighteen and

forty-five* years, and shall consent in writing (with the consent of his parent or guardian, if a minor) to subject himself to all the duties and obligations to which his principal would have been subject, had he personally served, shall be accepted in lieu of such principal after being examined and passed by the examining surgeon of the county.

"The persons thus drafted shall assemble at the county seat of their respective counties, within ten days from the time of drafting, or be considered absent without leave; whence transportation will be furnished them to the place of general rendezvous.

"The Commissioners in connection with the Sheriffs of counties will collect and bring to the county seat in their respective counties all the men drafted under this order, who may be absent without leave at the time specified for them to report as above, and if not found by them, they will report their names and places of residence to the commandant of the general rendezvous, who will immediately take measures for their apprehension.

"Detroit Barracks will be the general rendezvous for the drafted men in this State, under the command of Lieut. Colonel J. R. Smith, U. S. Military Commander."

In accordance with these directions the draft for the county of Clinton was made under the supervision of the respondent. Among the names returned in that county as liable to military duty was that of Jacob Spangler, the relator. In writing this name on the ballot for the draft box, the final letter was omitted by mistake, and that ballot being drawn, a notice directed to Jacob *Spangle* was served upon the relator, apprising him of the draft, and of the place of rendezvous. No other person by the name of Spangle or Spangler was returned as liable to military duty in that county.

The relator not reporting himself for duty in accordance with the notice served upon him, the Draft Commissioner

took him into custody to convey him to the general rendezvous. And he returned to the writ of habeas corpus that he claimed Spangler under the military authority of the United States.

*J. L. Chipman*, for the relator.

*A. Russell, U. S. District Attorney*, for the respondent.

MARTIN CH. J.:

Were it not for the importance of the jurisdictional question presented in this case, and the imperative necessity for its settlement at this time, I should content myself with deciding that, upon the undisputed facts of this case, there is no error in the proceedings of the Draft Commissioner, and that Spangler must be re-delivered to his custody. His name was fully given and properly spelled upon the enrollment, and the trifling mistake of dropping out a letter from his name upon the ballot, when the person was clearly designated, could not render the draft invalid.

But I am not willing to turn the case off upon this point. The main and all important question is one of jurisdiction, and it is this which I shall consider. The solution of this question depends, in my view, entirely upon that of whether Spangler is held by the Draft Commissioner under Federal or state authority; for, if under the former, we have no jurisdiction, while if under the latter, we have.

I do not concede that the return of the Commissioner that he holds Spangler under or by virtue of the authority of the United States, is of itself sufficient to deprive us of jurisdiction to inquire into the cause of his detention— for this is a traversable fact—but I do concede, that if so held, we have no jurisdiction to inquire further as to the legality of such detention, but that the whole subject is exclusively within that of the courts of the United States.

The first question, therefore, is, under what authority is he held?

The Constitution of the United States, Art. 1, sec. 8, empowers Congress to raise and support armies, to provide for calling forth the militia to execute the laws of the Union, to suppress insurrection, and to repel invasion, and to provide for organizing, arming, and disciplining the same, and for governing such part of them as may be employed in the service of the United States, reserving to the States respectively the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress, and to make all laws which shall be necessary and proper for carrying such powers into execution.

The Constitution itself was framed and adopted for the purposes, among others, of ensuring domestic tranquillity, and promoting the general welfare of the people of the United States; and the power of regulating the militia, and of commanding its services in times of insurrection, are natural incidents to the duty of watching over the internal peace of the Union. (See *Federalist, No.* 29). This whole power was conferred upon Congress, reserving only to the states the appointment of the officers, and the training of the militia according to the discipline prescribed by Congress. In the exercise of this power, Congress, by the act of July 17th, 1862 (Ch. 201), enacted that the President should call forth the militia, and if by reason of defects in existing laws, or in the execution of them, in the several states, or in any of them, it should be found necessary to provide for enrolling the militia and otherwise putting the act into execution, he was authorized in such case to make all necessary rules and regulations for such purpose — the power of calling forth the militia already being reposed in him by existing laws. By virtue of this authority, upon the 4th of August, 1862, the President ordered a draft of 300,000 militia, to be immediately

called into the service of the United States, and directed the Secretary of War to assign the quotas to the States, and establish regulations for the draft, &c.

Such assignments were accordingly made, and upon the 9th of August orders were issued from the War Department, requiring the Governors of the respective states to proceed forthwith to furnish their respective quotas, directing an enrollment to be made of all able-bodied citizens between the ages of 18 and 45, and providing and ordering that where no provision was made by law in any state for carrying into effect the draft thereby ordered, or when such provisions were in any manner defective, the draft should be conducted in a manner specified in such order. One provision of which requires the Governor to appoint a Draft Commissioner for each county, fixing his compensation, and giving minute directions to him as to the discharge of his duties. The Governor of this State, finding that an imperfect military census had been taken, and that there were defects in our state laws, that inequality would occur in their execution, observed, in ordering the draft in question, the law of Congress and the orders of the War Department, and did not proceed under the state law. In this he exercised an executive discretion, with which we cannot interfere, and which, I think, was wise and proper. As he was not executing the laws of Michigan, he was, of necessity, obeying the laws of Congress and the orders of the President. The Draft Commissioner appointed by him, was consequently a federal, and not a state officer, and the draft was made and the relator is now held under federal authority. The only remaining question is that of the jurisdiction of this Court, and of state officers, to inquire into the regularity of the draft, and the legality of Spangler's detention. Upon this question I think there can be no doubt that we have none. The Federal Government and the state governments exist as independently as the governments of the several

states. Each acting within its sphere is foreign to the other, and independent; and this principle extends to the jurisdiction of the courts of each. Except in the case of the appellate jurisdiction conferred upon the Supreme Court of the United States, the courts have jurisdiction only commensurate with the law of the state or nation under which they severally exist. An abuse of the authority of the United States, although committed by a citizen of this State, is an offense (says Chan. Kent) against the United States, and exclusively cognizable in their courts. If this be so, the exercise of power under such authority is equally under such exclusive jurisdiction. The views of Chief Justice Taney in *Ableman v. Booth*, 21 *How.* 506, are so apposite and exhaustive of this subject, and meet so fully with my concurrence, that it is hardly possible for me to do more than to refer to them as containing the whole law upon the subject. Questions of this kind, as he says, must always depend upon the Constitution and laws of the United States, and not of a state. The Constitution was not framed merely to guard the states against danger from foreign nations, but mainly to secure union and harmony at home: for if this object could be attained, there would be but little danger from abroad; and to accomplish this purpose it was felt by the statesmen who framed the Constitution, and by the people who adopted it, that it was necessary that many of the rights of sovereignty which the states then possessed should be ceded to the General Government, and that in the sphere of action assigned to it, it should be supreme, and strong enough to execute its own laws by its own tribunals, without interruption from a state or from state authorities.

The writ must be dismissed for want of jurisdiction.

MANNING J.:

The first question that meets us in this case is one of jurisdiction—a question, it must be admitted, of more than

ordinary importance, as it· involves a construction of the Constitution of the United States as to the power of the federal and state courts, in the use of the writ of *habeas corpus*, to discharge from imprisonment persons illegally deprived of their liberty.

We have two governments — a state government and a federal government. Each of these governments is supreme within its appropriate sphere. The line that separates the powers of the two is not at all times easy to trace. Some parts of it are well defined, while other parts of it are more obscure, and difficult to follow. This is owing, in part, at least, to the double relation we sustain as citizens of both governments, subject to the laws and regulations of both, and owing allegiance to both.

According to the theory of our government, the sovereign power is in the people. And viewing that part of it delegated by them for governmental purposes as a whole, the two governments together make that whole. In this sense neither is a whole in itself, any more than the legislative, executive or judicial part of the government is the whole government. Each of these departments is but a part of the government, acting independently of the others, and at the same time correlatively with them; and so closely are they bound together as a whole, that it is not at all times an easy task to find where the independent action of one of them ceases and that of another begins. It is not, therefore, at all surprising that a like difficulty should sometimes be experienced in determining between the powers of the federal and state governments, as a whole; — in fixing the precise point where the functions of one cease to act, and those of the other begin to act. The power to act in a given case we may know exists in one of the two, but in which, may not be so easy of solution; and yet it may be necessary to the harmonious action of the ·sovereign power delegated to them that it should be solved. For, without the independent, harmonious and correlative action

of both, we can hardly expect to gather the golden fruit anticipated by our fathers in the formation of our somewhat complicated, and yet simple form of government.

The two governments, in the sense already stated, are only one whole. Without either we should have but half a government; a fact too frequently overlooked, and we fear too little regarded by us, when we permit ourselves to become the partizans of either, in opposition to the other. We should think a man very unreasonable who should attempt to increase his powers of locomotion by strengthening one of his limbs at the expense of the other. This shows us the great care that should always be kept in view by each government, while determining its own powers, not to encroach on the powers of the other.

Neither is supreme, in the sense that it has power to dictate to or control the other, when acting in its appropriate sphere. Each is supreme within its own sphere. Neither is supreme within the sphere of the other. A common constituency supports, upholds, and gives vitality to both. To the Federal Government belong all questions outside of the states that pertain to us as a nation, and such powers within the states as are given to it by the Federal Constitution, in express terms or by clear implication; while all local and municipal powers not ceded to the Federal Government, belong to the states. Each has its writ of *habeas corpus*. Each has power under its constitution to suspend the writ on the happening of a certain contingency. The object of the writ is the same in both governments. It is to release from imprisonment, within its judicial limits, persons entitled to its protection who are deprived of their liberty without warrant of law.

The territory of a state is common to both governments. The territorial jurisdiction of both governments, therefore, so far as it respects the State, is the same. But is the judicial jurisdiction incident to the writ of *habeas corpus* the same? We think not. Otherwise the powers of the

federal and state courts, as it regards this court, are identical; and if they have a common concurrent jurisdiction, the power given to either government by its Constitution, to suspend the writ, for all practical purposes is a nullity, as neither can suspend the writ of the other, and as the only effect of a suspension by one, would be the same as that of abolishing the jurisdiction of one of two writs having a common concurrent jurisdiction, viz: to drive the suitors of both courts into the one whose jurisdiction was left unimpaired. Besides, if both governments have a common jurisdiction in the use of this writ, we have two independent governments, neither responsible to the other, acting upon the same subject matter. One may imprison, and the other release from such imprisonment, for the former to renew the imprisonment, and the latter again set free, until the stronger overpowers the weaker.

Any construction of the Federal Constitution that leads to such results, must necessarily be erroneous. We can not suppose the people, in adopting the Federal Constitution, intended to make such a distribution of the sovereign power delegated by them as to place one part of it in antagonism to another.

There must, therefore, from the very nature of our institutions, be a line separating the powers of the two governments, on this, as well as on every other subject.

The question then arises, where is that line, and what constitutes it? There can be but one. And that appears so clear to my mind (it may appear differently to others) that I almost wonder how any other should ever have been thought of. It is this: that the state courts have the right, and it is their duty, in all cases authorized by the laws of the State, to issue the writ of *habeas corpus* to inquire into the legality of the imprisonment of any person deprived of his liberty within the State, and to discharge him therefrom if wrongfully imprisoned, unless he is imprisoned or restrained of his liberty by the Federal Government.

By this I mean, not by one acting in his own right, but by one acting for and in right of, and under authority from the Federal Government; or claiming in good faith and under color of such authority to be so acting. I use these last words for the reason that good faith and color of authority are necessary to prevent imposition, and to oust the state jurisdiction. These being judicially ascertained, the state court can go no further. It can not inquire into the validity of the authority, or the legality of the detention under it; for this would be taking jurisdiction of the whole question.

The state courts have a right to inquire whether the person imprisoned is within the state jurisdiction, which he must be if in the State, unless he is deprived of his liberty by authority of the Federal Government; in which case he is not, so far as it regards his imprisonment and the state writ of *habeas corpus*. In the language of Chief Justice Taney, in the cases of *Ableman v. Booth*, and the *United States v. Booth*, 21 *How.* 523, "He is then within the dominion and exclusive jurisdiction of the United States." He is, as it regards the state *habeas corpus*, as completely beyond its reach for the purpose of releasing him, as he would be were he not within the State. Up to the point of imprisonment by the Federal Government the state *habeas corpus* has jurisdiction. It then ceases and the jurisdiction of the federal *habeas corpus* begins. In all cases of imprisonment, other than by the Federal Government, the State writ of *habeas corpus* has exclusive jurisdiction. In all cases of imprisonment by or under authority of the Federal Government, the federal writ of *habeas corpus* has exclusive jurisdiction.

Instances have occurred in which the writ of each government has been sent across this line into the dominions of the other. Such irregularities are calculated to produce irritation, and bring on an unseemly conflict between the state and federal courts, and thereby disturb the har-

monious action of the two governments. As we have already said, any construction of the Federal Constitution that leads to such results, must be untenable.

From the return to the writ, and the papers attached to and forming a part of the return, it appears that Spangler is held by virtue of a draft made under the laws of Congress and orders of the War Department of the United States. The fact that the Governor, as appears by his proclamation, thought proper to act in ordering the draft (and we do not question his right) under the laws of Congress and orders of the War Department, instead of the laws of the State, does not change the power under which the draft was made, and Spangler is held by the Draft Commissioner. The State Executive is the conduit through which the power passes that holds the prisoner; and for the true character of that power we must look to its source, and not to the channel through which it flows. If one of our Sheriffs should be deputed by the United States Marshal to serve a writ from the federal court, this Court would have no authority to entertain a motion to set aside the service, because it was made by the Sheriff. And it would not alter the case if the State should be interested in the prosecution of the suit in which the service was made.

The writ and all further proceedings under it, I think, should be dismissed for want of jurisdiction.

CHRISTIANCY J.:

I concur with my brethren in the result at which they have arrived in this case; but as there is a difference in the mode of arriving at that result, it is proper that I should briefly indicate the grounds of my opinion.

Had the Commissioner sought to hold the prisoner under the state law, authorizing a draft, there could be no doubt of the jurisdiction of this Court to issue this writ of *habeas corpus*, and to discharge the prisoner, at any time

before he had been actually mustered into the service of the United States.

But the Draft Commissioner does not claim to detain the prisoner under the state law; and it is evident from the face of the papers set out in the return, that no attempt was made to effect the draft under the state law.

The draft here in question was made solely under the authority of the act of Congress of July 17, 1862, and the order of the President made for the purpose of carrying this law into effect — the order of the Secretary of War being the order of the President, as clearly as if issued and signed by the President himself.

But it is objected that, in pursuance of the act of Congress, the draft should have been had under the state law, which, for this purpose, had been recognized by the act, except in cases where the President should first decide, with special reference to this State, that the state laws were defective, or defectively executed, and should, therefore, issue his orders, specially applicable to this State, prescribing the manner in which the enlistments should be made and the act carried into effect: that he had no right to issue the general order stated in his return, leaving it to the Executive of the respective States to determine the question.

The act of Congress of July 17, 1862 (*sec.* 1), does not declare by whom this question is to be determined, but merely that "If, by reason of defects in existing laws, or in the execution of them, in the several States, or any of them, it shall be found necessary," &c., the President is authorized to make such rules and regulations. The power is made contingent only upon the fact of such a condition of the State laws, or of their execution: not upon the determination of the question by any particular person or officer. And I can see no reason why the President may not act, when this fact is found by the Governor of a State, upon whom the call is made for men, as well

11 MICH.—U.

as if found by the President. The Governors of the States must be much more intimately acquainted with the character of the State laws, and the difficulties and defects in their execution; and, practically, it seems to me, the question must, as a general rule, be left to the determination of the State Executive, except in those States where either the state authorities or the people are supposed to be disloyal to the Federal Government. Should the Governor inform the President that the laws of his State were so defective, or defectively executed, that he could not furnish the requisite number of men in due season under them, it could hardly be expected that the President would overrule his decision. Or, take the reverse of the case here given, and suppose the Governor to have decided that the laws of his State are neither defective nor defectively executed, and that he so informs the President, could it be expected that the President would disregard this decision or opinion of the Governor, and proceed to require the draft to be made under the act of Congress and his own executive order, without reference to the state law? Should the President thus act, we should doubtless have more complaints than we have yet heard of his exercise of arbitrary power, and certainly with more reason.

Hence I am satisfied that though the President may decide upon this question of the defective condition or execution of the state laws, in States which are in insurrection, or more or less affected by the rebellion, or where there is good reason to apprehend disloyalty on the part of the State Executive, yet he may, if he see fit, and should, in other cases, leave this question to be decided by the State Executive. Hence, I think the President was fully justified in issuing the general order, attached to the return, regulating the enrollment and draft in all cases where laws of the State are defective or defectively executed, leaving it to the State Executive to determine the

question: and when so determined by the State Executive, that determination, as in the present case, is equally valid and effectual as if made by the President himself. The effect, therefore, of the President's order and the proclamation of the Governor, his appointment of Draft Commissioners and of the action of such Commissioners, are, I think, the same as if all these proceedings for the enrollment and draft had been especially and directly prescribed by the act of Congress.

The Draft Commissioner appointed by the Governor, must, I think, be considered as acting for, and exercising the authority of the Federal Government, and as a federal officer for the performance of these duties, as much as if he had been directly appointed by the President. The men to be raised by the draft were to be raised for the federal and not the state service. The whole proceeding was an exertion of federal and not state authority, for the purpose of selecting the men who were to be called into service, and, so far as the relator is concerned, for the purpose of bringing him into the service of the United States. The error in copying the name did not, I think, affect the validity of the proceedings, as the identity of the person intended was clearly ascertained. The proceedings were, I think, valid, and imposed upon the relator the duty of entering the service, and authorized the Commissioner to hold him for that purpose. If, therefore, the state judiciary have jurisdiction to determine the questions arising under the present writ, the relator should, I think, be remanded to the custody of the Commissioner.

But should these views be erroneous, still, I think, beyond all controversy, there is enough appearing in the case to show that the Commissioner in good faith claims to hold the relator under federal authority — that this authority is not set up as a mere pretext; but that the Commissioner and the authorities under whom he acts are honestly endeavoring to carry into effect the require-

ments of an act of Congress and the Federal Executive in a matter vital to the safety of the nation. The question, therefore, of the authority of the Commissioner to hold this prisoner for the purpose stated, is one which I think appropriately belongs to the federal and not the state judiciary. Upon this point of the jurisdiction, as applied to the facts of the present case, I concur with the Chief Justice and my brother Manning.

In either view of the case, therefore, the prisoner cannot be discharged by this Court.

CAMPBELL J.:

Under the act of Congress of July 17th, 1862, the Governor of Michigan was called upon, through the War Department, to furnish troops for the service of the United States, to a specified number. The requisition from the Secretary of War set forth certain measures, which he was recommended to adopt, in case the state laws had not adequately provided for the emergency. The principal one of these suggestions, which becomes important in this case, is that commissioners should be appointed by him, to take charge of the drafting when that should be resorted to, and see that it was properly carried out. The relator was enrolled, and, not having made out any claim to exemption or disability, his name was attempted to be copied from the list on a slip of paper, with the other names, and the slip placed in the box and drawn out. Upon this slip the name was written "*Spangle*," instead of "*Spangler*." No other person of the same or any similar name resided in the drafting district, and his name was properly spelled on the list from which the slip was copied. He failed to appear when warned, and was arrested, and now claims to be discharged, on the ground that the proceedings to draft him have been had by the state authorities, in disregard of state laws, and that they cannot be justified under any other.

MATTER OF SPANGLER.

The question of misnomer is not one that can be conclusive in such a case. If the relator's name had not been properly enrolled, it would have been open to more doubt, perhaps; but how far the mistake would have vitiated the draft is not material in this case. But here the person was not only identified clearly, but all the steps necessary, previous to the placing the slips in the box, were regular. This slip was copied from the correct list, and the omission was a clerical error, which, under the facts, could not possibly have caused confusion. The slip drawn was the one which had been placed in the box to represent him, and I think did represent him when drawn. The law does not require the name itself to be put in the box. The number corresponding to it is equally available; and all that can be required, as it seems to me, is that the slip drawn should appear, beyond doubt, to represent the person properly named in the roll from which it is copied.

The question, then, which it becomes necessary to determine, is whether he is lawfully held by the authorities of the State of Michigan. And as the course of the argument has necessarily involved an inquiry into the source and extent of the authority of the various public officials who have had charge of the raising of troops, and questions of jurisdiction have become involved, among others, it seems unavoidable that the subject, from its present importance, should receive more extended notice than might suffice in ordinary cases.

No question arises here concerning any forces except those which are technically and legally called the *militia*, as in no other cases is the drafting system applied through the state authorities.

Congress has power, under Article 1 section 8 of the Constitution, " to provide for calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasions;" and also " to provide for organizing,

arming and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the States respectively the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress."

By section 2 of Article 2 it is provided that "The President shall be Commander in Chief of the army and navy of the United States, *and of the militia of the several states, when called into the active service of the United States.*"

Even without the aid of the uniform practical construction which is to be found in the legislation of Congress, from the organization of the Government, there could be no difficulty in coming to a conclusion on some, at least, of the most important questions attending the establishment and use of the militia force, which we are now called upon to consider.

In the first place, it has been understood that Congress may and should determine the classes of persons from whom the militia should be filled up, either entirely, or so far as it can be done without injuring the necessary organizations of the General and State governments. This it has done by declaring, in general terms, that it shall be composed of all the free, able bodied white male citizens of the respective States, resident therein, of the age of eighteen years and under the age of forty-five years, except such persons as are by the acts of Congress, or by the state laws, expressly exempted:—1 *U. S. Stat.* 271. Congress having declared of whom the militia shall consist, may provide and has in a general way provided, for organizing, arming and disciplining them. But Congress, as we have seen, can not *govern* them, except when employed in the service of the United States; and they can only be called into the service of the United States when they are wanted for active duty, in protecting or

vindicating the authority of the Government, against actual or expected resistance. In time of peace (which may fairly be expected to be our ordinary condition), Congress has, then, no direct agency in managing the militia; and although it may prescribe how they are to be organized, equipped and disciplined, yet the actual government is to be exercised by the states. All the machinery is therefore in ordinary times in the hands of the states. That the requirements of Congress are as binding on them as on individuals is unquestionably true. The question is not whether they can lawfully omit the duties enjoined upon them. The only question which concerns us, in the present inquiry, is whether, in performing these duties, they act as mere agents and ministers of Congress, or whether they act as communities, recognized by the Constitution, and owing the performance of these particular functions to the mandates of the Constitution, as directed especially to themselves. The language of that instrument, where it gives Congress power to govern the militia when called into service, shows that their government at other times is not by Congress. In other words, while they are sometimes governed by the State, and sometimes by Congress, they are never governed by both at the same time; and the governing action therefore can not be a mere agency on either side. Nor is the President commander in chief of the militia not called into service.

This doctrine has always been recognized as applicable to the militia system, by the acts of Congress, which refer the whole work of organization to the State laws and authorities. And no one, in time of peace, or in time of war, would hesitate in declaring that, when not in government service, the militia are under State authority. Assuming that the courts of the Union will not interfere with parties in state custody or control, nor the state courts with those under the control or custody of the United States, we are to inquire whether, in the present instance,

the relator is in the custody of the United States or of
the authorities of the State of Michigan. The answer to
this inquiry may properly determine how far we ought to
proceed in the investigation of the facts before us. The
question does not introduce any antagonism of jurisdictions,
for all of these matters are undoubtedly regulated by the
Constitution, in order to promote the efficiency of the
militia to secure the safety and protection of the entire
country; and the functions thus separately vested are so
separated, because the separation was regarded as desirable,
to secure economy of general expenditure, and to save the
multiplication of offices, and the other familiar difficulties
which have been so happily avoided by our composite
system. By leaving each branch of jurisdiction where it
belongs, we are only obeying a rule which is addressed
to both alike by the same authority, which is our supreme
guide in legal action.

The Constitution contemplates that every available man
in the country may be required by Congress to be included
in the militia — subject to such exceptions as they may
allow, or as the nature of our institutions may require.
We must also assume that it contemplates that, whenever
required, some means must exist by which their services
may be obtained. Congress may provide for calling out
the troops, but the orders must necessarily emanate from
the Commander in Chief, under whose control the troops
in service must be held. The act of 1862 (in substantial
conformity in this regard with former laws) authorizes the
President of the United States to call forth the militia, for
such period not exceeding nine months as he may appoint,
and declares that the militia so called shall be mustered
in, and continue to serve for the term specified, unless dis-
charged by the order of the President. This law, like all
the other statutes, distinguishes between the calling forth
and the mustering in, and makes the mustering in the com-
mencement of service. This is in strict accordance with the

decisions in *Houston v. Moore*, 5 *Wheat.* 1, and *Martin v. Mott*, 12 *Wheat.* 19, in both of which cases it was held that the militia did not cease to be state troops until received into the actual service of the United States. The case would have raised no difficulty had it not been for some further provisions in the act of Congress, which are supposed to have introduced a more direct agency of the Union authorities into the work of getting the forces in the field. The act provides that "if by reason of defects in existing laws, or in the execution of them, in the several States, or any of them, it shall be found necessary to provide for enrolling the militia and otherwise putting this act into execution, the President is authorized in such cases to make all necessary rules and regulations," &c. And in pursuance of this act, the Secretary of War issued a request to the Governor of Michigan, to furnish the quota of this State; suggesting at the same time the propriety — in case the existing state laws had not made adequate provision for the emergency—that commissioners should be appointed to superintend the drafting operations; and making some further recommendations. These recommendations were accepted by the Governor, and issued in the form of general orders. It is claimed that this action was an assent on his part to waive his official authority as Executive of Michigan, and to perform duties as an agent of the War Department; and it is claimed on the other hand that he was acting as Governor, and that his action was void because not had under any law which he could as Governor carry out; on the ground that he must carry out the state laws if any. And these objections on the one hand to the jurisdiction of this Court, and on the other to the legality of the Governor's action, are somewhat closely connected.

It was claimed on the argument that any regulations in aid of the defects of existing laws, or their execution, must be made by the President; and that these regulations emanate not from him but from the Secretary of War, and

are therefore invalid. This objection is not maintainable. The Secretary of War is in this respect nothing more than the channel of executive action; and it is well settled that his action is to be regarded as the action of the President—at least until disapproved. The President is not obliged to leave his more important duties to attend to official details; and the action of his secretaries must be presumed to have been directed or approved by him, so as to make it his own:— *Wilcox v. Jackson*, 13 *Pet.* 498; *U. S. v. Eliason*, 16 *Pet.* 291; *Williams v. U. S.*, 1 *How.* 290; *Parker v. U. S.*, 1 *Pet.* 293. Nor can the fact that, instead of adopting regulations by act of Congress to supply deficiencies, the President was authorized to adopt these regulations, change the relation of the State to the Union authorities, where the state authorities are called upon to act. There is nothing in the Constitution which requires Congress to adopt such specific regulations in regard to the performance of the duty of calling out the militia. That duty must be performed by the executive authorities; and, if the laws were entirely silent on the subject, the President, when authorized to call out the forces, must of necessity have power enough to provide methods and adopt regulations for enabling the men to be obtained. As supreme Executive of the nation, and as Commander in Chief of the forces called out, he has certainly been invested with all needful authority. It would be absurd to suppose that where he is empowered to determine without appeal, and absolutely, the existence of a state of things which justifies military interference, and is also empowered to call out the forces and suppress resistance to the Government, he is powerless, after exercising these high prerogatives, to direct how to carry out his own lawful orders, unless every one else shall have performed the duties devolving upon them. Public emergencies like those contemplated in the Constitution, do not admit of delay, and require broad discretionary powers in all matters of detail; and Con-

gress, in leaving these matters to his discretion, not only vested in him no strange or unusual powers, but acted wisely. The defects in different parts of the country could not be supposed to be the same. The state laws differ, and in some places more complete preparation had been made than elsewhere. In some places, where troops might lawfully be called for, the ordinary local action was not to be looked for at all, by reason of the presence of rebellion.

Uniformity of action, therefore, could "not be expected, and the matter was properly left to the discretion of the President, which, when exercised in such matters, must be respected. *U. S. v. Eliason*, 16 *Pet.* 291; *Martin v. Mott*, 12 *Wheat.* 19; *Luther v. Borden*, 7 *How.* 1; *People v. Lewis*, 7 *Johns.* 73; *Lockington v. Smith, Pet. C. C.* 466; *Vanderheyden v. Young*, 11 *Johns.* 150. It is one of the fundamental rules of construction, that when duties are imposed upon an executive officer of the Government, and he is confined to no specified method of carrying them out, he may select such means as are reasonable and proper, at his option.

So far as the State of Michigan is concerned, the President has not found it necessary to do anything more than to make the proper requisition on the Governor; leaving· him to carry it into effect by the state laws, if under them provision had already been adequately made to furnish the troops; and if not, by other means — suggesting, as appropriate in such case, the steps actually taken. That these suggestions or requests are equally valid with a positive order, there can be no question. The requisition for troops is such an order, whether made in one shape or another. *Martin v. Mott*, 12 *Wheat.* 19. Although, as an executive head of a State, there may be no process of compulsion directly against a Governor (as decided in *Commonwealth of Kentucky v. Denison, Governor of Ohio*, 24 *How.* 66), yet he would be guilty of

a gross violation of duty were he to disregard such a requirement; and the call must then be carried out through other channels. But this immunity from ordinary process has led with manifest propriety to the use, in intercourse between public officials, of the courtesy common between nations, of resorting to requests instead of peremptory demands — a courtesy which the authorities of this State have fairly deserved. But it is made a question whether the Governor can lawfully exercise such a discretion as is here left to him, of determining whether resort is necessary to any new mode of action.

To determine this, we must first look to see precisely the nature of the discretion so remitted to him. It does not involve merely the question whether the state laws have made adequate provision for answering the call of the President. The act of Congress contemplates that there may be adequate laws inadequately carried out. The first question is, to some extent, one of law; and yet not entirely, because the adequacy of the laws may depend somewhat upon the nature of the emergency. The second question is one involving considerations of mixed law and fact, peculiarly proper for executive consideration, and as plainly proper to be determined by the local Executive, who alone can have complete access to the necessary information. When he, as the organ of the State, is called upon to furnish troops, he is necessarily required to come to a conclusion whether those troops are attainable by ordinary means, and at once. If not, the call of the Government must be disregarded, or resort must be had to other necessary and proper means. But to disregard the call would be to violate the Constitution of the United States, which gives Congress an absolute right to authorize the President to make the call. In Michigan the Governor is made, by the Constitution itself, " Commander in Chief of the military and naval forces, and may call out such forces

to execute the laws, to suppress insurrections, and to repel invasions." He, therefore, is invested with such discretionary powers as are vested anywhere; and, as in the case of the President, he must have sufficient power to carry out any duty imposed upon him by the Constitution or the laws. In military emergencies he has the combined powers of a civil executive and of a military Commander in Chief, subject, of course, to any constitutional restrictions, but subject to nothing which will prevent his obeying the Constitution. What might be the consequence of a needless resort to any but the regular and ordinary machinery of arriving at a lawfully prescribed result, where such machinery exists, is only to be regarded when such violation of duty appears. The orders of the President do not contemplate any needless resort to discretionary means, and it is not to be presumed that any such resort has been had without necessity. But it is proper to examine the state law of 1862, with reference to the variations from it which have occurred.

The law provides how an enrollment shall be made, but expressly authorizes the Governor to cause the lists to be made by any other person when deemed necessary for the public safety. *Laws* 1862, *p.* 22. Of this necessity the Governor is sole judge. In obtaining from each county the necessary number, the Governor is directed to notify the Sheriff of the number required, and thereupon the Sheriff is required to notify the County Clerk or his deputy; and, together, they are to copy from the lists and put in the box all the names on these lists, and draw them as jurors are drawn; and the persons so drawn, and *liable to do military duty*, shall be determined to be legally held to serve. In drawing jurors, if a person drawn is known to one of the attendant officers to be dead, or insane, or to have permanently removed from the county, another may be drawn in his stead. *Comp. L.*, § 4363. If the Sheriff and Clerk have a similar

power in drafting, they have no further power. The only preliminary method of establishing exemptions, provided for by the statute of 1862, is by application to the assessors, at the annual review of the assessment rolls. *Laws* 1862, *p.* 47. The officers are required to note as exempt, at that time, all who are actually exempt by law, whether claiming exemption or not. But the law does not give them final and conclusive powers in the matter, and, if the lists are made out otherwise than by them, it gives them no power at all. It is manifest that if the draft is made by the Sheriff and Clerk under this statute, the number actually drawn may be materially diminished, not only by exemptions, but by personal disabilities, unknown or arising after the annual review. The law of Congress contemplates that, when the States are called upon to furnish troops, they shall furnish able-bodied soldiers; and, although possibly some latitude is necessary in doing this, yet some means of securing in advance, as near as may be, the selection of men who may be lawfully held to service, must be regarded as very desirable, if not absolutely necessary. The appointment of these commissioners, in accordance with the President's suggestion, to conduct the draft, by making it, or causing it to be made, in what is certainly a substantial compliance with all the safeguards of the statute, furnished a method of securing, with considerable accuracy, against drafting exempts, or persons physically unfit for service. In this matter the Governor has adhered as closely to the law as was possible, and has carried out its, design, by supplying its manifest deficiencies. So far as the arrest is concerned, the law is literally complied with; for it contemplates that other proper officers than the Sheriff may have custody of the delinquent; and, where the person is not to be mustered in within the county, the Sheriff has no power, under his mere *official* authority, to go beyond his own bailiwick. It is evident that the law can only be carried

out by some discretionary agency, under the control of the Governor. But, even if the law in this respect were complete in its details, it permits a discharge by the Sheriff on payment of a penalty, which is not recognized by the act of Congress, and which, if allowed, would prevent the Governor from furnishing the state quota, inasmuch as no draft is provided for in lieu of the person commuting. The Governor has not, in my judgment, gone beyond the fair exercise of a legal discretion; and it is unnecessary, therefore, to consider how far this Court could, if it were not so, review his conduct.

I am of opinion that the relator is lawfully detained by the Draft Commissioner, under the military authority of the State of Michigan; and that he should remain at the disposal of that officer, as lawfully drafted for service.

*Ordered that the relator be remanded to the custody of the Draft Commissioner.*