## In re Griner, and others.

A writ of *habeas corpus* will not be granted if it appears from the application *prima facie*, that there is not sufficient ground for the discharge of the party imprisoned.

The act of congress of February 28, 1795, which provides for calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasions, confers on the President authority to detail, draft, and call into the field, the quotas of militia of the several states, and to make all necessary rules and regulations for that purpose.

That part of the act of congress of July 17th, 1862, which provides, that " if by reason of defects in existing laws, or in the execution of them in the several states, or any of them, it shall be found necessary to provide for enrolling the militia and otherwise putting this act in execution, the President is authorized in such cases to make all necessary rules and regulations; and the enrolment of the militia shall, in all cases, include all the able bodied male citizens, between the ages of eighteen and forty-five, and shall be apportioned among the states according to representative population," does not confer on the President any new or additional powers; but by this provision, it was intended that the President should, in making a draft, avail himself of the provisions of state laws so far as they were applicable, and where they were not, or there was no state law on the subject, that in such cases he would exert the authority conferred on hi

by the act of Feb. 28, 1795, and make proper rules and regulations for calling forth and drafting the militia.

The making, by the President, of rules and regulations for calling forth and drafting the militia, is not the exercise of a power strictly and exclusively legislative.

A distinction exists between those important subjects which must be entirely regulated by congress, and those of less interest, in reference to which a general provision is made and power is given to those who act under it to fill up the details, as incidental to its execution.

The act of Congress giving the President power to make all necessary rules and regulations to carry into effect the law for calling out the militia, is not a delegation of the legislative power of congress.

APPLICATION to the Supreme Court, for a writ of *habeas corpus*, made in term time, by Henry S. Pierpont, on behalf of *Frederick Griner, Lewis Sucke, Peter Paul Turk, Valentine Paulus, Drauget Augustine, Nicholas Kerr, Titus Werner,* and *August Barthel,* representing, among other things, that they were jointly restrained of their liberty, and jointly imprisoned in the county of Dane, on one and the same pretext and pretended cause, by Col. Daniel J. Dill, to-wit: That one Alfred Marschner, who claimed to be an officer appointed and commissioned by the governor of the state, and not otherwise, called a draft commissioner for making a draft of the militia of the state for the county of Manitowoc, claimed and claims to have drafted the said petitioners as militia-men of the said state, within twenty days then past, and for that cause imprisoned them in said county of Manitowoc, and removed them in his custody from there to a military camp in said Dane county, and there together, delivered them into the custody of said Col. Daniel J. Dill, an officer of the volunteers of said state, in command of said camp; that the said Col. Daniel J. Dill there detained and imprisoned them as drafted militia-men of said state for the county of Manitowoc, with intent and design to deliver them over to the custody of some military officer of the United States, to perform military duty; that the said restraint and imprisonment is illegal for the reason that the said Alfred Marschner is not and was not legally authorized to make a draft of the militia of the state

for the county of Manitowoc, and that the said pretended draft was and is wholly illegal and void, and for the reason that the said pretended appointment of the said Alfred Marschner as draft commissioner and his proceedings as such, and the said pretended draft of the militia of said state for the county of Manitowoc, are altogether unauthorized and without color of legal authority, made under any statute or law of said state or of the United States, and altogether arbitrary and unlawful; and it prayed for a writ of *habeas corpus* to be directed to the said Col. Daniel J. Dill, &c. Upon this application, the court made an order that the prayer of the petition be heard on the 17th of February, at the sitting of the court, and that a copy of the order and of said petition be served on the attorney general of the state, and the attorney of the United States for the district of Wisconsin, three days before the time fixed for such hearing. Due service of said order and petition having been made, a hearing of the petition was had, when the rules and regulations made by the President for making a draft of the militia of the several states, were read and commented upon by counsel for the petitioners, in connection with the petition and the acts of congress hereinafter mentioned, and are as follows: "1st. That the Governors of the respective states will proceed forthwith to furnish their respective quotas of the 300,000 militia called for, by the order of the President, dated the fourteenth of August, 1862, which quotas have been furnished to the governors, respectively, by communication from this department of this date, according to the regulations hereinafter set forth. 2d. The governors of the several states are hereby requested forthwith to designate rendezvous for the drafted militia of said states, and to appoint commandants therefor, and to notify the secretary of war of the location of such rendezvous and the names of the commandants. It is important that the rendezvous should be few in numbers, and located with a view to convenience of transportation.

3d. The governors of the respective states will cause an en-

In re Griner et al.

rollment to be made forthwith, by the assessors of the several counties, or by any other officers to be appointed by such governors, of all able-bodied male citizens between the ages of 18 and 45, within the respective counties, giving the name, age and occupation of each, together with remarks showing whether he is in the service of the United States, and in what capacity, and any other facts which may determine his exemption from military duty. All reasonable and proper expenses of such enrollment and of the draft hereinafter provided will be reimbursed by the United States, upon vouchers showing the detailed statements of service performed and expenses incurred, to be approved by such governors. 4th. Where no provision is made by law in any state for carrying into effect the draft hereby ordered, or where such provisions are in any manner defective, such draft shall be conducted as follows : *First*, Immediately upon completion of the enrollment, the lists of the enrolled persons shall be placed in the offices of the sheriffs of the counties in which such enrolled persons reside. *Second*, The governors of the several states shall appoint a commissioner for each county of their respective states, whose duty it shall be to superintend the drafting, and hear and determine the excuses of persons claiming to be exempt from military duty. Such commissioner shall receive a compensation of four dollars a day, for each day he may be actually employed in the discharge of such duty as such commissioner. *Third*, The enrolling officer shall immediately upon the filing of the enrollment lists, notify said commissioner that said lists have been so filed, and the commissioner shall thereupon give notice, by handbills in each township of his county, of the time and place at which claims of exemption will be received and determined by him ; and shall fix the time to be specified in the order aforesaid, within ten days of the filing of the enrollment, at which the draft shall be made, and all persons claiming to be exempt from military duty shall, before the day fixed for the draft, make proof of such exemption before said com-

missioners, and if found sufficient, their names shall be stricken
from the list by a red line drawn through them, leaving them still
legible.    The commissioner shall in like manner strike from
the list the names of all persons now in the military service of
the United States; all telegraph operators and constructors ac-
tually engaged on the fifth day of August, 1862, all engineers
of locomotives on railroads, all artificers and workmen em-
ployed in any public arsenal or armory, the Vice President of
the United States, the officers, judicial and executive, of the
government of the United States. the members of both houses
of congress, and their respective officers, all custom house offi-
cers and their clerks, all post officers and stage drivers who are
employed in the care and conveyance of the mail of the post
office of the United States, all ferrymen who are employed at
any ferry on the post road, all pilots, all mariners actually em-
ployed in the sea service of any citizen or merchant within the
United States, all engineers and pilots of registered or licensed
steamboats and steamships, and all persons exempted by the
laws of the respective states from military duty ; on sufficient
evidence, or on his personal knowledge that said persons be-
long to any of the aforesaid classes, whether the exemption is
claimed by them or not.    Exemption will not be made for dis-
ability, unless it be of such a permanent character as to render
the person unfit for service for a period of more than thirty
days, to be certified by a surgeon appointed by the governor, in
each county, for that purpose.    *Fifth.* At the time fixed as
before provided by the commissioners for making the draft, the
sheriff of the county, or in his absence, such person as the com-
missioner may appoint, shall, in the presence of said commis-
sioner, publicly place in a wheel or box, of a like character of
such as are used for drawing jurors, separate folded ballots,
containing the names of all persons remaing on said enrollment
lists not stricken off as before provided, and a proper person,
appointed by the commissioner, and blindfolded, shall there-
upon draw from said box or wheel a number of ballots,

equal to the number of drafted men fixed by the governor of such state, as the proper quota of such county. *Sixth,* A printed or written notice of his enrollment and draft, and of the place of rendezvous of the drafted military force, shall thereupon be served by a person to be appointed by the commissioner, upon each person so drafted, either by delivering the same in person or leaving it at his last known place of residence. *Seventh,* Any person so drafted may offer a substitute at the rendezvous of the drafted militia force, and such substitute, if he shall be an able bodied man, between the ages of eighteen and forty-five years, and shall consent in writing (with the consent of his parents or guardian, if a minor) to subject himself to all the duties and obligations to which his principal would have been subject, had he personally served, shall be accepted in lieu of such principal. *Eighth,* The persons thus drafted shall assemble at the county seat of their respective counties, within five days after the time of drafting, whence transportation will be furnished them by the governors of the respective states, to the place of rendezvous. *Ninth,* As soon as the draft has been made and the names marked on the enrollment lists, the commissioner will send a copy of the draft to the commandant of rendezvous, and another of the same to the adjutant general of the state, who will immediately organize the drafted men into companies and regiments of infantry, by assigning one hundred and one men to each company, and ten companies to each regiment, and send a copy of the organization to the commandant of the rendezvous. *Tenth,* At the expiration of the time allowed for the drafted men to reach the rendezvous, the commandant shall proceed to complete the organization of the companies and regiments, by proclaiming the names of the regimental commissioned officers, which shall be designated in accordance with the laws of the respective states, the number and grade being the same as in the volunteer service; and in case the laws of any state provide for an election of officers, they shall

be elected under the direction of the commandant of the rendezvous and reported forthwith to the governors of such states in order that they may be commissioned, and the non-commissioned officers may be appointed either before or after muster, as the colonel of the regiment shall decide. *Eleventh*, As soon as the officers of the companies and regiments are designated, the muster rolls shall be made out under the direction of the commandant of the rendezvous; and the troops inspected and mustered into the service of the United States, by the mustering officers appointed for that purpose. *Twelfth*, The states where enlistments have been made by municipalities and towns instead of counties, the governors of such states are authorized to apply the foregoing rules of draft to such municipalities and towns instead of counties 5th. Provost marshals will be appointed by the war department in the several states on the nomination of the governors thereof, with such assistants as may be necessary to enforce the attendance of all drafted persons who shall fail to attend at such place of rendezvous. 6th. In case any state shall not, by the 15th day of August, furnish its quota of the additional 300,000 volunteers called for by the President on the 2d day of July, 1862, unless otherwise ordered, all incomplete regiments shall then be consolidated by the governors of the respective state, and an additional draft shall be made as before provided, sufficient to fill up such quota. The number to be drafted from each county of the state to be fixed by the governor thereof. 7th. From and after the 15th of August no new regiments of volunteers will be organized by the present bounty, and advance pay will continue to be paid to those volunteering to go into the old regiments."

*E. G. Ryan*, for the petitioners, in support of the motion, submitted an able and elaborate argument, a synopsis of which he promised to furnish for this report, but it has not been received.

There was no appearance or argument on the other side.

*By the Court*, COLE, J.    This is an application on behalf of *Frederick Griner, Louis Sucke, Peter Paul Turk*, and others, residents of the county of Manitowoc, who are jointly restrained of their liberty and are jointly imprisoned in the county of Dane, on the same cause or pretext; for a writ of *habeas corpus* to discharge them from military restraint or control.

The petition sets forth and states that they were all drafted as militia-men, by a draft commissioner appointed to make the draft for Manitowoc county; and they allege and insist that the said draft was and is, wholly illegal and void.    This is the principal matter stated in the application.    As these allegations fairly and necessarily present upon the face of the petition the question whether the recent draft in this State was "without color of legal authority under any statute or law of this state or of the United States, and altogether arbitrary and unlawful," we deemed that question of sufficient importance to justify us in requiring an argument upon it before the writ was granted. Besides, it was understood that this was the real question upon which the decision of the court was desired.

If the draft shall be held valid or authorized by law, then it follows that this application must fail, as no other ground than its alleged invalidity is relied upon, to show that the military restraint is unlawful.    And further, it is a well established principle of law, that before a writ of *habeas corpus* is granted, sufficient probable cause must be shown, and when it appears, upon the party's own showing that there is no sufficient ground *prima facie* for his discharge, the court will not go through the idle ceremony of bringing before it the petitioner, when he must be immediately remanded to his former custody.    *Ex parte Booth*, 3 Wis. R., 145: *Sims' case*, 7 Cush., 285 : *Passmore Williamson's case*, 26 Penn. St. 9 : and other cases cited by Hurd on Habeas Corpus, 224.

The inquiry then, presented at the very outset of our examination, is whether the draft was authorized by law ?    The

power of Congress to raise and support armies ; to provide for calling forth the militia, to execute the laws of the Union ; suppress insurrections and repel invasions; and to provide for organizing, arming and disciplining the militia ; and for governing such part of them as may be employed in the service of the United States, is clear and indisputable. The language used in the constitution in making this grant of power is so plain, precise and comprehensive, as to leave no room for doubt or controversy, as to where the supreme control over the military force of the country resides. This power of commanding the service of the militia in times of insurrection and invasion is a natural incident to the duties of superintending the common defense, and of watching over the internal peace of the country, and was wisely vested in congress by the framers of the constitution. And the main question we have now to consider, is as to the manner and extent which this power has been exercised on the part of congress.

By the first section of chapter 201 of the United States statutes at large of 1862, congress provided that whenever the President of the United States shall call forth the militia of the states, to be employed in the service of the United States, he may specify in his call the period for which service will be required, not exceeding nine months, and that the militia, so called, shall be mustered in and continue to serve for and during the time so specified, unless sooner discharged by command of the President. This act is supplemental to, and amendatory of the act of February 28th, 1795, (1 U. S. Statutes at large 424,) which provides for the calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasions. There is another act of congress, which perhaps it may be proper to refer to in this connection, which is that of May 8th, 1792, for establishing an uniform militia in the United States. (1 U. S. St. at large, 271.) These are the principal laws passed by congress providing for calling forth and organizing the militia of the country for its defense

and support. It must be conceded that they are not as full and extended in their provisions, regulating the manner in which the militia of each state is to be drafted and detached, as congress might have prescribed. Laws might have been passed regulating the whole details of the mode in which a draft was to be made, had this been deemed essential to a full execution of the powers conferred upon congress by the constitution. But instead of this, general provisions were made, authorizing the President to *call forth* the militia, and to issue his orders for that purpose to such officers of the militia as he might think proper; and as the particular emergency should arise. In the last clause of the first section of the act of July 17th, 1862, discretionary authority is vested in the President for executing the draft, in the following language: "If by reason of defects in existing laws, or in the execution of them in the several states, or any of them, it shall be found necessary to provide for enrolling the militia and otherwise putting this act into execution, the President is authorized in such case to make all necessary rules and regulations; and the enrollment of the militia shall in all cases include all able-bodied male citizens, between the ages of eighteen and forty-five, and shall be apportioned among the states according to representative population." Now it is insisted that this provision renders the law of 1862 unconstitutional and void, because it is said to be an attempt on the part of congress to delegate its legislative power upon the subject of detaching, drafting and calling forth the militia, to the President. This, it is argued, is apparent, as well from the language of the provision as from its scope and object. The reasoning by which this position was attempted to be sustained, was very able and elaborate, and may be briefly stated as follows: The making a draft or a conscription law is the highest exercise of legislative power; that all power over this subject is vested exclusively in congress; that by the spirit and principles of the constitution, the powers of the government are divided into

three departments: the legislative, the executive, and the judicial; that it is the peculiar function of the legislative department to make the law, of the executive to execute it, and the judicial to construe it; that these powers are not to be confounded or delegated by the one department to the other; and that congress, in authorizing the President to make all necessary rules and regulations for enrolling the militia, and curing defects in existing state militia laws, attempted to confer upon him high legislative powers.

The general soundness of this argument will not be questioned. Most of the propositions stated, are recognized political maxims under our form of government. It is only the conclusion or deduction from those propositions about which any doubt can exist. No one will seriously contend that congress can delegate legislative power to the president. But a distinction must be made of "those important subjects which must be entirely regulated by the legislature itself, from those of less interest in which a general provision may be made, and power given to those who are to act under such general provision to fill up the detail." It would seem that the power given to the President to make all rules and regulations to carry into effect the law for calling out the militia, is of the latter character. Congress might have regulated by its legislation the whole details of the draft, if it had thought proper to do so. But having, in the most ample manner, clothed the President with power to call forth the militia, it further provided that he should make all proper rules and regulations for the enforcement of the draft where state laws upon the subject were defective. Where state laws existed, it was undoubtedly intended or supposed that the President would avail himself of their machinery, in bringing into the field the quota of the state. When the militia were once called forth, it was a matter of no vital importance how they should be detached and drafted. Congress indicated an intention of adopting the state laws upon the subject, as far as they were applicable; when

they were not applicable, or none existed, the President was authorized to make proper rules and regulations for enrolling the militia and drafting them. And this no more partakes of legislative power, than that discretionary authority intrusted to every department of the government in a variety of cases. This practice of giving discretionary power to other departments or agencies, who were intrusted with the duty of carrying into effect some general provisions of law, had its origin at the adoption of the constitution, and in the action of the first congress under it, as the federal legislation abundantly shows. It was undoubtedly in strict conformity to the views entertained by the great statesmen of that day, of the genius and intent of the instrument which they had had such a great share in framing. They could not have regarded it as a delegation of the legislative power of congress. This practical construction of the constitution, so frequently and constantly manifested in the federal legislature, is worthy of serious consideration. The attorney general, in another case argued at this term, furnished numerous instances, where such discretionary power is given to other functionaries by congress. It would render this opinion needlessly prolix to refer to all these laws. A few of the more striking and signal examples of this species of legislation may be profitably noticed. In 1798, when a war with France was deemed imminent, congress authorized the raising of a provisional army, and provided that the companies of volunteers, and the members of each company who should be duly engaged and accepted by the President of the United States, and organized with proper officers commissioned by him, should submit to and observe such rules of training and discipline, as should be thought necessary to prepare them for actual service; *which rules the President of the United States is hereby authorized to make and establish.*" Chap. 57, 1 U. S. Stat. at large, 569. This legislation was had, although the constitution confers, in clear and specific terms, upon congress the power " to make rules for the government and regulation of land

and naval forces, and for arming and disciplining the militia."
Exclusive and unlimited power of legislation is given to congress by the constitution, over the District of Columbia; still, congress has organized and established within the district, municipal corporations, conferring upon them all the powers of police and local legislation which are common and incident to such corporations. The constitution gives congress the "power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." Under this grant, congress has organized various territorial governments, clothing them with great powers of local government.

In execution of the power conferred upon it, congress has established courts of the United States, and passed several acts regulating processes in such courts. The state laws regulating the modes of proceeding in suits at common law, as they stood in 1789, were adopted, "subject, however, to such alterations and additions as the said courts respectively shall in their discretion deem expedient, or to such regulations as the supreme court of the United States shall think proper from time to time, by rule, to prescribe to any circuit or district court concerning the same." (1 U. S. Stat. at large, p. 275, chap. 36, sec. 2.) In the case of *Wayman vs. Southard*, 10 Wheaton, 1, the supreme court gave a construction to this provision, and held that it enabled the several courts of the Union to make such improvements in their forms and modes of proceeding as experience might suggest, and especially to *adopt such state laws on this subject, as might vary to advantage the forms and modes of proceedings which prevailed in September*, 1789," p. 42. The objection was taken in that case, which is urged here, that this was a delegation of legislative power to the courts of the Union. It was claimed and insisted that the rules by which the citizen was deprived of his liberty or property, or by which judicial sentences were enforced, were of vital importance, and could only be prescribed by the legislative depart-

ment of the government. In answering this objection, Chief Justice MARSHALL employs language so clear and pointed to the question we are now considering, that I cannot do better than cite it at some length. He says: "The counsel for the defendants contend that this clause, if extended beyond the mere regulation of practice in the court, would be a delegation of the legislative authority which congress can never be supposed to intend, and has not the power to make. But congress has expressly enabled the courts to regulate their practice by other laws. The 17th section of the judiciary act of 1789, chap. 20, enacts, 'that all the said courts shall have power to make and establish all necessary rules for the orderly conducting of business in the said courts, provided such rules are not repugnant to the laws of the United States; and the 7th section of the act' in addition to the act entitled an act to establish the judicial courts, of the United States, (act of 1793, chap. 22, sec. 7,) details more at large the powers conferred by the 17th section of the judiciary act. These sections give the court full power over all matters of practice; and it is not reasonable to suppose that the process act was intended solely for the same object. The language is different; and the two sections last mentioned have no reference to state laws. It will not be contended that congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative. But congress may certainly delegate to others, powers which the legislature may rightfully exercise itself. Without going farther for example, we will take that, the legality of which the counsel for the defendants admit. The 7th section of the additional act, empowers the courts respectively to regulate their practice. It certainly will not be contended that this might not be done by congress. The 17th section of the judiciary act, and the 7th section of the additional act, empower the courts respectively, to regulate their practice. It certainly will not be contended that this might not be done by congress. The courts, for example, may make

rules directing the return of writs and processes, the filing of declarations and other pleadings, and other things of the same description. It will not be contended that these things might not be done by the legislature, without the intervention of the courts; yet it is not alleged that the power may not be conferred on the judicial department. The line has not been exactly drawn, which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provision to fill up the details. To determine the character of the power given to the courts by the process act, we must enquire into its extent. It is expressly extended to those forms and modes of proceedings in suits at common law, which were used in the state circuits in September, 1789, and were adopted by that act." In another place he adds: "The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law; but the maker of the law may commit something to the discretion of the other departments, and the precise boundary of this power is a subject of delicate and difficult inquiry, into which a court will not enter unnecessarily."

The clear result of the argument in *Wayman vs. Southard*, was, that the courts had power to adopt rules to regulate proceedings and executions; although the point in judgment was, whether the execution laws of Kentucky, passed subsequent to the process acts, applied to executions issued by the circuit courts of the United States. Opinion of Justice McLEAN, in *Ross vs. Duval*, 13 Peters, 45. See *The Bank of the United States vs. Halstead*, 10 Wheaton, 51. Under this discretionary authority thus given the federal courts, they have from time to time altered their processes in such manner as they deemed expedient, enlarging their effect and operation so as to sustain forms of action given only by state law. *Fullerton vs. Bank of the United States*, 1 Peters, 604. Other examples of this

same species of legislation might be given, if it were necessary to maintain the validity of the clause in the act of 1862 ; examples where congress has conferred upon other departments, the power to make rules and regulations within the great outlines marked out by the legislature.

Considerable stress was laid upon the language employed in this provision : " If, by reason of defects in existing laws, or in the execution of them, in the several states, it shall be found necessary to provide for enrolling the militia, and otherwise putting this act into execution, the President is authorized in such cases to make all necessary rules and regulations."

This it is claimed, evinces a clear design on the part of congress, to give the President power, not only to adopt such means as might be convenient and proper, for carrying into effect existing laws, but likewise clothes him with authority to make new laws upon the subject of enrolling and drafting the militia in states where none exists. But the main object of the law of 1795, and of July 17, 1862, is to provide 'for bringing into the field the whole military force of the country, when necessary for its defense and safety, and to clothe the President with power adequate for this purpose. Congress declared in this act itself, what should constitute the militia, namely, the able-bodied citizens of the respective states, between the ages of eighteen and forty-five, liable to do military duty, and this, with the act of May 8, 1792, establishing a uniform militia, covered the whole ground of congressional legislation. As already observed, instead of giving the President any discretion as to the manner of executing the draft, congress might have regulated the whole matter by specific legislation. But this was not done, congress having conferred upon the President, the vast power of calling forth the military force of the the country, when the emergency specified in the statute existed, gave as an incident to this power, authority to make the call effective, and to detach and draft the militia, and bring them into the actual service of the United States. Such is the

result of the legislation of congress; and upon this point we are not without direct judicial authority, in support of the views expressed.

In *Houston vs. Moore*, 5 Wheat., 1, the question was presented to the supreme court of the United States, whether it was competent for a court-martial, deriving its jurisdiction under state authority, to try and punish militia-men drafted, detached and called forth by the President into the service of the United States, and who had refused or neglected to obey the call. The court decided the question in the affirmative. But the discussion necessarily led to an examination of the laws of congress, upon the subject of organizing the militia, and as to what provision had been made for bringing them into the field upon an order or requisition of the President.

Mr. Justice WASHINGTON, who delivered the leading opinion in the case, after giving a summary of the laws of congress, employs this language: " The laws which I have referred to, amount to a full execution of the powers conferred upon congress by the constitution. They provide for the calling forth the militia to execute the laws of the Union, suppress insurrection, and repel invasion. They also provide for organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the United States; leaving to the states respectively, the appointment of the officers, and the authority of training them according to the discipline prescribed by congress. This system may not be formed with as much wisdom, as in the opinion of some it might have, or as time and experience may hereafter suggest. But to my apprehension, the whole ground of congressional legislation is covered by the laws referred to. The manner in which the militia is to be organized, armed, disciplined and governed, is fully prescribed; *provisions are made for drafting, detaching and calling forth the state quotas, when required by the President.* The President's orders may be given to the chief magistrate of the state, or to any militia officer he may think

proper; neglect or refusal to obey orders is declared to be an offense against the laws of the United States, and subjects the offender to trial, sentence and punishment, to be adjudged by a court-martial, to be summoned in the way pointed out by the rules and articles of war, and the proceedings to be observed by these courts is detailed with all necessary perspecuity." 5 Wheat., 15.

Now it is to be observed that the learned and distinguished justice refers to no law of congress, and relies upon none, in which specific provisions are made "*for drafting, detaching and calling forth the state quotas when required by the President.*" He evidently considers, that this power is included in the more extensive one of calling forth the militia; otherwise he could not say, that provision had been made for drafting, detaching and calling forth the militia, unless the execution of a draft, and prescribing the manner in which it should be made, was incidental to the power of calling forth.

Mr. Justice JOHNSON, who concurred in the decision of the court, but for somewhat different reasons than those assigned by Mr. Justice WASHINGTON, makes use in his opinion, of the following: "I have no doubt that under the powers given the President by the act of 1795, and under the restriction contained in the 4th section of that act, it was in the power of the President to have issued orders to the Adjutant General of Pennsylvania, to bring into the field its quota of militia, *and to have prescribed the manner in which they should be drafted and detached*: and had this been done, every thing would have been sensible and consistent, and the exigences of both these laws would have been satisfied. It is obvious that the act of 1814 recognizes the construction which makes the *drafting* and *detaching* as necessary to precede the calling forth ; and if the power to call forth existed in the President alone, it would seem that the other subordinate, but necessary auxiliary powers, to which this act has relation, must have existed in him also, and could be exercised by him or under his authority only." P. 43.

The act of April 18, 1814, here referred to (3 U. S. St. at large, 134, chap. 82), was one in addition to that of February 28th, 1795. It prescribed the manner of conducting courts-martial assembled for the trial of offenses committed by "militia drafted, detached and called forth for the service of the United States." But how was this militia drafted or detached? Were they not to be drafted and detached under some law of congress? "There is nothing in this law or any other, that designates the drafting and detaching or calling forth, there expressed as the ground of jurisdiction, as a drafting, &c., under the laws of a state." And to our minds it is clear that the act of 1814 was intended to provide for the punishment of offences committed by militia drafted under the law of 1795. And congress must have supposed that the President under that act had the power to draft and detach the militia, or it would not have referred to them in the terms it has in the act of 1814.

It is true Mr. Justice STORY and another Justice dissented from the decision of the court in *Houston vs. Moore*, but not upon grounds or for reasons which weaken its force upon the point we are now considering. Justice STORY held, in effect, that congress having acted upon the subject, and executed the power conferred upon it, by providing for the organization, arming and disciplining the militia, and for calling them forth, this legislation was supreme and conclusive, and state power over the subject prohibited. But this view by the clearest implication, concedes the power of the President to detach, draft and call out the militia under the act of 1795. A careful examination of *Houston vs. Moore*, will abundantly show that the judicial exposition of the legislation of congress upon this subject is not misapprehended. Chancellor KENT, speaking of the decision in that case, says: "The case of *Houston vs. Moore*, settled some important questions arising upon the national authority over the militia. The acts of congress already referred to, and the act of 8th May, 1792, for establishing a uniform militia, were considered as covering the whole

ground of congressional legislation over the subject. The manner in which the militia were to be organized, armed, disciplined and governed, was fully prescribed; *provision was made for drafting, detaching* and calling forth the state quotas, when requested by the President. His orders were to be given to the chief executive magistrate, or to any militia officer he might think proper. Neglect or refusal to obey his orders was declared to be a public offense, and subjected the offender to trial and punishment, to be adjudged by a court-martial, and the mode of proceeding was perspicuously detailed." 1 Kent, p. 285, eighth ed.

Now if the construction placed upon the act of 1795 by the supreme court be correct, then it follows as a necessary result, that no new or additional powers were conferred upon the President by the clause in the act of 1862, to which strong objection is taken. For according to that construction, the President possesses, as incident to the power of calling forth the militia, or in other words there is included in that power, the one to detach and draft the militia, and bring them to the support and defense of the United States. And this the President may do, without the aid or machinery of any state legislation upon the subject whatever, by virtue of the provisions of the act of 1795. The federal government is clothed with ample powers of self preservation and self defense, whether assailed by traitors at home or enemies abroad. Full authority in respect to the creation and direction of the national forces, is conferred upon congress. This power has been as fully executed as congress deemed necessary by the enactment of the laws of 1795 and 1862.

If this view be correct, the question may be asked, why congress incorporated such a clause in the act of 1862? If it gave the President no new or additional power in respect to drafting and calling forth the militia, why encumber the statute books with it? It is useless and idle, and can have no possible effect given it. The reply to this objection is, that the

clause is not wholly useless, for by it congress clearly indicates an intention that the President should execute the draft according to the state laws, where any existed on the subject, which were adequate to the purpose. / Under the law of 1795, he could make the draft independent of, and without any reference to state legislation.    But under the law of 1862 it was intended the President should avail himself of the machinery of the state for drafting, as far as it could be applied, and where no system on the subject existed, as was the case in this state, that then he would exert the original authority conferred upon him by the law of 1795. / The enrollment and detaching of the militia are largely ministerial acts, which could be wisely and discreetly performed under the direction of the chief executive officer of the nation.    If not properly done, congress could readily correct the evil by specific legislation upon the subject.    So, although we had no laws in this state regulating the manner of executing a draft, yet the President, under the powers conferred upon him by congressional legislation, had authority to detach, draft and call into the field our quota of militia to quell the rebellion and execute the laws of the Union.

The result of these views is, that the application for a writ of *habeas corpus* must be denied.