Druecker vs. Salomon.

## DRUECKER vs. SALOMON.

*Validity of the draft of 1863.—Liability of Governor for arrest and detention of persons resisting the draft.*

1. The decision of this court *In re Griner*, 16 Wis., 423, that the acts of Congress of 1795 and 1862, providing for calling forth the militia of the U. S., are valid; that the president has authority, under the act of 1795, to detach and draft the militia without the aid of state legislation; and that under the act of 1862 he could exercise the authority so conferred in a state which had no law on the subject of drafting—reaffirmed.
2. The rules and regulations for enrolling and drafting the militia adopted by the president and promulgated by the war department, under which a draft was made in this state in 1863, were valid; and the draft commissioners appointed by the governor, and the governor himself while engaged in enforcing the draft pursuant to those regulations, were officers of the United States.
3. The president (excepting his liability to impeachment) is the exclusive judge whether the emergency has arisen under which he shall call forth the militia under the statute; and his decision is binding upon all persons.

4. Persons who conspired to resist, and did forcibly resist the execution of the draft, were guilty of "levying war" against the United States; and those who were engaged in the conspiracy, performing any part therein however minute, were guilty of the crime though not personally present at the immediate scene of violence.

5. In case of an officer acting under the president, if his duty is merely *ministerial*, one injured by him under color of his office may have legal redress; but where he exercises a *discretionary* authority, he is not liable.

6. The defendant, being governor of this state at the time of the insurrection in Ozaukee county to resist the draft in 1863, and acting under the authority of the president, did not exceed the discretionary power conferred upon him in arresting the plaintiff and detaining him in custody for twelve days; and is not liable therefor in an action for damages.

APPEAL from the Circuit Court for *Milwaukee* County.

Action for false imprisonment. The case is stated in the opinion. The jury, by direction of the court, found for the defendant, and the plaintiff appealed from the judgment.

*Hugh Cunning*, for the appellant.

*Winfield Smith* and *Mat. H. Carpenter*, for the respondent.

DOWNER, J. This is an action for false imprisonment. The plaintiff alleges that he was unlawfully arrested at Port Washington, in this state, on the 12th day of November, 1862, and detained in custody until the 19th day of January, 1863. The defendant answering admits the arrest; denies that the plaintiff was held in custody by him after the 25th day of November, 1862; and avers that he was then governor of the state of Wisconsin, and as such governor, under the laws of the United States, authorized to enforce the draft in Wisconsin; that the plaintiff and others were arrested by him to suppress a riot against the laws of the state and an insurrection against the laws of the United States, to forcibly oppose the execution of the draft; that such insurrection was suppressed by the arrest of persons known to be engaged therein, or believed upon reasonable grounds to be so engaged, among whom was the plaintiff; and that such persons, including the plaintiff, were held in custody no longer than in the opinion of the

defendant was necessary to suppress the insurrection and enforce the laws.

The testimony, in substance, on the part of the plaintiff, is, that he was arrested on the 13th day of November, by order of the provost marshal, acting under the orders of the defendant, and kept in custody until about the 19th day of January, 1863. On the part of the defense it was proved, that the defendant was governor, and acted as such, under the order of the secretary of war and rules and regulations prescribed by the president of the United States through the war department, in appointing enrolling and draft officers and in enforcing the draft; that he appointed Wm. A. Pors draft commissioner for the county of Ozaukee, and that the tenth day of November, 1862, was fixed as the day for the draft to take place for that county, at Port Washington; that the defendant was authorized by an order of the secretary of war to use the United States troops in the state, when necessary to enforce the draft; that for several days before the tenth, it was manifest that a great part, probably a majority, of the people of Ozaukee county, were opposed to the draft; and that many of them were apparently determined that there should be no draft in that county. On that day, before the draft commissioner had commenced drafting or attempted to, a large body of men marched through the street, carrying a flag, on which, in large letters, were the words "No Draft;" that when the commissioner was about to commence drafting, he was assaulted, stoned, badly bruised and beaten, and compelled to run for his life; and he, being hunted by the mob, secretly left the town. Those engaged in the riot or insurrection, then went to his house and destroyed his furniture, and the doors and windows of the house, and otherwise injured it; and did the same to the houses and furniture of several other loyal citizens. The mob continued its work all that day into the night and part of the next day, to the great terror of quiet and loyal people, de-

manding and receiving money of some, and destroying the property of others, and searching for persons whom they threatened to hang, and carrying a large part of the time the flag with "No Draft" on it; and some of them were armed with guns. It was proved that the plaintiff, on the ninth, the day before the draft was to be made, said there would be no draft; and on the morning of the tenth, before the assault on Pors, he painted the words "No Draft" on the flag; and on the same day, according to the testimony of one witness, after Pors' house and furniture had been nearly destroyed by the mob, and before the house of one Stillman had been plundered and destroyed by the same mob, the plaintiff went where they were, and hallooed, "Hurrah boys! I have got news from Milwaukee that they can't draft there; and if they can't draft there, they can't draft here. Go on boys." The plaintiff, in his testimony, denied that he ever addressed the mob, but admitted that he painted the words on the flag. It was also proven that the governor was informed of the resistance to the draft, and the state of things at Port Washington, and sent the provost marshal for the state, with a part of the 28th regiment of Wisconsin volunteers, to enforce the draft and arrest those resisting it; that the troops reached Port Washington on the morning of the twelfth of November, and proceeded to arrest those who, according to the best information they could obtain, had been engaged in resisting the draft; and among them was the plaintiff. It was also proved that those following the "No Draft" flag at times amounted to several hundred; and that a detachment of soldiers sent out to make arrests after the arrival of the troops, came within sight of a body of the rioters, from 100 to 200, who seemed to be on their way to Port Washington, most of them armed with guns, and some of them fired on the soldiers, who captured about fifty of them with their guns. The evidence also tends to prove that the civil authorities sympathized with the movement to resist the

draft, and were utterly powerless to suppress the riot, if they had desired to do it; and that none of the rioters have ever been punished by the civil authorities.

The circuit court instructed the jury to find for the defendant. The plaintiff maintains that the instruction is erroneous; and this presents the main question for our consideration. Did the court err in giving the instruction? The plaintiff insists that there was no law authorizing the draft, and no evidence tending to prove that either he or those resisting the draft committed any crime against the laws of the United States. This court held *In re Griner*, 16 Wis., 423, that the act of Congress of February 28, 1795, and the act of July 17, 1862, which provide for calling forth the militia of the United States to execute the laws, suppress insurrections and repel invasions, are constitutional and valid; that the president, as incident to the power of calling forth the militia, has authority to detach and draft the militia, and that he could do this without the aid of any state legislation, by virtue of the provisions of the act of 1795; that although it was intended that the president, under the act of 1862, should avail himself of state laws for drafting in such states as had such laws, yet, as there was in this state no law on the subject, he could exercise the power conferred on him by the act of 1795. We are satisfied of the correctness of that decision, and think it is fully sustained by the authorities cited in the opinion. See also *In re Spangler*, 11 Mich., 298. It follows from that decision, that the rules and regulations respecting enrolling and drafting the militia, adopted by the president and promulgated through the war department, are valid; and if valid, the draft commissioner appointed by the governor was an officer of the United States. It was so held in the case of Spangler, above cited. If the draft commissioner was a federal officer, the governor, in executing the draft, acted not under state but under national authority, and was also an officer of the United States, obeying

the orders of the president. 12 Wheaton, 33. Did those re-
sisting the draft do any act or acts criminal by the laws of the
United States? "Levying war" against the United States is
the highest crime known to the laws of the land. That term,
as used in our constitution, is borrowed from the statute of the
25th Edward III, and long before it was used in our laws had
a fixed and definite meaning. Mr. Justice CURTIS says : " The
settled interpretation is, that the words ' levying war' include
not only the act of making war for the purpose of entirely
overturning the government, but also any combination forci-
bly to oppose the execution of any public law of the United
States, if accompanied or followed by an act of forcible oppo-
sition to such law, in pursuance of such combination. The
following elements therefore constitute this offense : 1st. A
combination or conspiracy, by which different individuals are
united in one common purpose. 2nd. This purpose being to
prevent the execution of some public law of the United States,
by force. 3rd. The actual use of force by such combination,
to prevent the execution of such law." The authorities fully
sustain this learned jurist. See *U. S. v. Vigol*, 2 Dal., 346;
*U. S. v. Mitchell*, id., 348; *Ex parte Bollman*, 4 Cranch, 75 ;
*U. S. v. Burr*, id., 481; Story on Con., §§ 1790–1795. Al-
though there must be force used, it is not necessary that there
should be any military array or weapons. The crime may be
committed by those not personally present at the immediate
scene of violence, if they are leagued with the conspirators,
and perform any part, however minute. The evidence, there-
fore, tends to prove that there was an insurrection at Port
Washington, and that those engaged in it committed the crime
of treason, and that the plaintiff was in the conspiracy ; that it
required military force to put it down ; and that the defendant
acted wisely in exercising the powers entrusted to him.

If, however, the question of the guilt or innocence of the
defendant depended upon the wisdom of his acts in exercising

the discretionary authority entrusted to him, it may be that the cause should have been submitted to the jury with proper instructions. But the defendant insists that discretionary power was entrusted to him, and that his acts in its exercise are of a judicial character, and that no civil tribunal, in an action by any one for private damages, has any right or authority to review his decision. His position, in brief, is, that the president has authority, whenever in his judgment he deems it best, to call forth the militia of the United States to suppress insurrections and enforce the laws ; that he is the sole judge to determine when the exigency arises, and his determination is conclusive upon all courts (save only in case of impeachment) ; and that when he has determined to call forth the militia, he can detach and draft them, and use all the force and make all the arrests that in his judgment are necessary to enforce the law ; that in doing this he exercises a discretionary power, and his determinations are final and conclusive ; that the authority vested in the president by the constitution and laws of the United States was by him, *pro hac vice,* delegated to the defendant, when the president, through his secretary of war, authorized him to employ the United States military forces in this state for the execution of the draft; and that this authority conferred on the defendant was discretionary, and in its character judicial.

It is a general principle of law, that a judicial officer is not responsible in an action for damages to any one for any judgment he may render, however erroneously, corruptly or maliciously he may act in rendering it, provided he has jurisdiction of the parties and of the subject matter of the action in which it is rendered. And every court must in the first instance pass upon the question of its own jurisdiction; and its decision upon that question is frequently conclusive and binding upon all persons ; especially is this the case as to the judgments of courts of last resort. An exemption similar to that of judges

from actions for their judicial acts, is extended to officers in the other departments of government, whenever they are intrusted with the exercise of discretionary power, and their determinations or decisions are in their nature judicial.

The power of the president to call forth the militia under the act of 1795, and whether he was the sole judge when the exigency had arisen, were considered by the supreme court of the United States in *Martin v. Mott*, 12 Wheaton, 19. Mr. Justice STORY, in delivering the unanimous opinion of the court in that case, in speaking of the exercise of the power to call forth the militia, says: "Is the president the sole and exclusive judge whether the exigency has arisen, or is it to be considered an open question, upon which every officer to whom the orders of the president are addressed may decide for himself, and equally open to be contested by every militia-man who shall refuse to obey the orders of the president? We are all of opinion that the authority to decide when the exigency has arisen belongs exclusively to the president, and that his decision is conclusive upon all persons. We think this construction necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of congress. The power itself is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the union. A prompt and unhesitating obedience to orders is indispensable to the complete attainment of the object. The service is a military service, and the command of a military nature; and in such case, every delay and every obstacle to an efficient and immediate compliance necessarily tend to jeopard the public interests. While subordinate officers or soldiers are pausing to consider whether they ought to obey, or are scrupulously weighing the evidence of the facts upon which the commander in chief exercises the right to demand their services, the hostile enterprise may be accomplished without the means of re-

sistance. If the power of regulating the militia, and of commanding its services in times of insurrection and invasion, are (as it has been emphatically said they are) natural incidents to the duties of superintending the common defense and of watching over the internal peace of the confederacy, these powers must be so construed as to the modes of their exercise, as not to defeat the great end in view. If a superior officer has a right to contest the orders of the president upon his own doubts as to the exigency having arisen, it must be equally the right of every inferior officer and soldier; and any act done by any person in furtherance of such orders would subject him to responsibility in a civil suit, in which his defense must finally rest upon his ability to establish the facts by competent proofs. Such a course would be subversive of all discipline, and expose the best disposed officers to the chances of ruinous litigation." He further says: "The law does not provide for any appeal from the judgment of the president, or for any right in subordinate officers to review his decision, and in effect defeat it. Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those facts. And in the present case we are all of opinion that such is the true construction of the act of 1795."

In *Marbury v. Madison*, 1 Cranch, 137, Chief Justice MARSHALL, after reasoning upon the political or discretionary powers of the president and heads of departments, says: "The conclusion of this reasoning is, that where the heads of departments are the political or confidential agents of the executive merely to execute his will, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of

VOL. XXI.—41.

that duty, it seems equally clear that the individual who considers himself injured has a right to resort to the laws of his country for a remedy." / The same principles are found in *Luther v. Borden*, 7 How. (U. S.), 1. / These principles obviously apply to military commanders, and to the various officers appointed by the president. Wherever the duties of the office are ministerial, any individual injured by the official acts of such officer, or by acts done by him under color of his office, may resort to the courts for redress. Wherever the officer acts in the exercise of a clearly and purely discretionary authority, his determinations partake of the character of judicial decisions. It is sometimes difficult to draw the exact line of distinction between ministerial and discretionary or judicial authority. The same officer may act sometimes in one capacity, and sometimes in the other. A sheriff, with an execution against the property of a particular individual, acts in executing it only as a ministerial officer; and if he takes any property to satisfy it except that of the defendant therein named, he is liable to an action. But the same officer, when he is authorized by law to suppress a mob, has more or less of discretionary authority entrusted to him. A military officer who should be directed by the president in time of war to arrest a particular individual as a spy, would act, in making the arrest, merely as a ministerial officer; and if by mistake he arrested the wrong man, he would be liable to an action. But if his orders were general, to go with military forces into an insurrectionary district and quell the insurrection, he would be clothed with authority discretionary, and in its nature judicial.

But it is unnecessary to pursue this line of reasoning further, or to enquire in what cases officers entrusted with authority discretionary, and which they are authorized to use only in case of necessity and on the occurrence of certain events, must, in an action against them them, allege and prove in justification the facts which show that the exigency has arisen.

We are of opinion that the undisputed facts in evidence in this case show that the exigency had arisen at the time the troops were sent to Port Washington, when the defendant had the legal right to use the troops as he in his discretion should deem best to enforce the draft, and that he is not liable for the arrest of the plaintiff. We do not see how we can come to any other conclusion. It is clear that the defendant did not transcend the discretionary authority conferred upon him. His acts must therefore be regarded, in a certain sense, as the acts of the president. The same principles apply to his defense as would to that of a military commander, if sued for acts by him done in fighting a battle to put down an insurrection or rebellion.

But it is said, such executive power is dangerous to liberty. Admit it. It is also absolutely necessary to every free government. Ever since the downfall of the feudal aristocracies of Europe, the champions of freedom have labored so to limit executive power as to prevent usurpation and despotism; and they have succeeded in England and in this country, by throwing around it various checks and safeguards. Not one of these would we remove, or do aught to impair its efficiency. While, however, executive power is dangerous to liberty, no government has ever existed long without it. Without it, in the great crises which await every nation, government dissolves in anarchy.

The next question is, whether the defendant is liable for detaining the plaintiff in custody after the arrest. He had a right to detain the prisoners, including the plaintiff, so long as in his judgment was necessary to prevent the further obstruction of the draft, and until they could safely be turned over to the civil authorities for trial. He kept them twelve days, when, by order of the president, they, including the plaintiff, were transferred to the custody of other United States officers, and beyond the control of the defendant. We think the same principles which control as to the arrest, apply

to the detention while the plaintiff was under the control of the defendant.

· *By the Court.*—Judgment affirmed.