### UNITED STATES v. OLSON.

### SAME v. SURANSKY.

(District Court, W. D. Washington, N. D.   November, 1917.)

#### No. 3785.

1. ARMY AND NAVY ⬤⟹20—SELECTIVE SERVICE ACT—INDICTMENT—SUFFICIENCY.
   An indictment alleging a failure to register as required by the Selective Service Act, etc., is not faulty because failing to set out in full the President's proclamation as to registration, where the statement with reference to the proclamation was sufficient to furnish the defendant notice and information required for every purpose.

2. WITNESSES ⬤⟹293—PRIVILEGES—BEARING WITNESS AGAINST SELF.
   Those provisions of the Selective Draft Act which require registrants to exhibit registration cards, etc., are not invalid, as violating Const. Amend. 5, providing that no person shall be compelled to be a witness against himself.

3. ARMY AND NAVY ⬤⟹20—SELECTIVE SERVICE ACT—VALIDITY.
   In view of the revolutionary practice of raising armies by draft, and of the provisions found in Const. art. 2, § 2, etc., and despite Amendments 5 and 13, *held*, that the Selective Service Act is valid; the government having power to raise armies by draft.

4. CONSTITUTIONAL LAW ⬤⟹275(1)—INHIBITIONS—DEPRIVATION OF PROPERTY.
   The Selective Service Act, providing for the drafting of registrants into the National Army, is not in violation of Const. Amend. 5, forbidding the deprivation of property without due process of law, for no one has, in a just sense, a property right in his office or employment.

5. CONSTITUTIONAL LAW ⬤⟹62—SELECTIVE SERVICE ACT—DELEGATION OF LEGISLATIVE POWERS.
   The Selective Service Act is not invalid, as delegating legislative powers to the President, for it merely grants power to him to regulate the execution of the law.

Peter Olson and Abraham Suransky were indicted for failing to register as required by the Selective Service Act, and for failing to exhibit their registration certificates when called upon by a police officer.   On demurrer to the indictment.   Demurrer overruled.

Clay Allen, U. S. Atty., and Ben. L. Moore, Asst. U. S. Atty., both of Seattle, Wash.

Mark M. Litchman, of Seattle, Wash., for defendant Olson.

Jacob Kalina, of Seattle, Wash., for defendant Suransky.

NETERER, District Judge.   Indictments were returned against each of the above-named defendants in three counts:   First, charging that defendant refused to present himself for registration, being

---
⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

within the ages of 21 and 31 years; second, charging that defendant "did willfully * * * fail * * * to present himself for registration and submit thereto as provided in the said act * * *"; and, third, charging that the defendant "did willfully * * * fail * * * to perform a duty required of him * * * in the execution of said act," by failing to exhibit his registration certificate when called upon by a police officer. Demurrers were filed to each count in the indictment: First, "that they do not state facts sufficient to constitute a crime;" second, "that the act is unconstitutional, contrary to the Constitution and Amendments 1, 2, 5, and 13." With the consent of all parties, the issues thus raised, being the same in both cases, were submitted together.

[1] The technical objection raised in argument that the indictment is faulty, because the President's proclamation provided for in Selective Service Act May 18, 1917, c. 15, 40 Stat. 76, is not set out in full in the indictment, is overruled. The statement in the indictment with reference to the proclamation is sufficient to give the defendant all the notice and information required for every purpose.

[2] Nor is the contention that the provisions of the act requiring a person to exhibit his registration card, as charged in count 3, in contravention of the Fifth Amendment, which provides that "no person shall be compelled to be a witness against himself." This provision is analogous with section 3239, Revised Statutes, Internal Revenue Act, as amended February 27, 1877, c. 69, 19 Stat. 248 (Comp. Stat. § 5962), which requires that all persons liable to a special tax " * * * shall place and keep conspicuously in his establishment or place of business all stamps denoting the payment of said special tax. * * *" This has long been recognized as within the sphere of proper legislation. Justice Field, in Ex parte Garland, 4 Wall. 333, 18 L. Ed. 366, sustains the doctrine that Congress can undoubtedly prescribe rules for civil conduct to which persons within the jurisdiction must conform. This case, while cited by defendants, cannot afford comfort to them. The issues in that case and this are not analogous. The court, in that case, at pages 379, 380 of 4 Wall. (18 L. Ed. 366), said:

"The Legislature may undoubtedly prescribe the qualifications for the office, to which he must conform, as it may, where it has exclusive jurisdiction, prescribe qualifications for the pursuit of any of the ordinary avocations of life. The question, in this case, is not as to the power of Congress to prescribe qualifications, but whether that power has been exercised as a means for the infliction of punishment, against the prohibition of the Constitution. That this result cannot be effected indirectly by a state under the form of creating qualifications we have held in the case of Cummings v. State of Missouri, 4 Wall. 277, 71 U. S. 356 [18 L. Ed. 356]; and the reasoning by which that conclusion was reached applies equally to similar action on the part of Congress."

The issue in Cummings v. Missouri, supra, was whether, under the form of creating a qualification or attaching a condition, a state can in effect inflict punishment for a past act which was not punishable at the time it was committed, and it was held that it could not be done. Again, at page 380 of 4 Wall. (18 L. Ed. 366), the court, in Ex parte Garland, said:

"This view is strengthened by a consideration of the effect of the pardon produced by the petitioner, and the nature of the pardoning power of the President. The Constitution provides that the President 'shall have the power to grant reprieves and pardons for offenses against the United States except in cases of impeachment. * * *' The power thus conferred is unlimited, with the exception stated. It extends to every offense known to law, and may be exercised at any time after its commission, either before legal proceedings are taken, or during their pendency, or after conviction and judgment. This power of the President is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders. The benign prerogative of mercy reposed in him cannot be fettered by any legislative restrictions. Such being the case, the inquiry arises as to the effect and operation of a pardon, and on this point all the authorities concur. A pardon reaches both the punishment prescribed for the offense and the guilt of the offender; and when the pardon is full it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. If granted before conviction, it prevents any of the penalties and disabilities, consequent upon conviction, from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity."

It will thus be seen that this case has no application.

[3] The next contention, that the Selective Service Act of May 18, 1917, is unconstitutional, is equally unfounded. The contention that the President has not power to raise and support an army by the selective method cannot be sustained. For the purpose of creating a strong national government, instead of a weak and ineffective confederation of states, the Constitution conferred upon the Congress the power:

"To provide for the common defense and general welfare," "to declare war," "to raise and support armies," "to provide and maintain a navy," "to make rules for the government and regulation of land and naval forces," "to provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states, respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by the Congress."

Article 2, § 2: "The President shall be commander-in-chief of the army of the United States, and of the militia of the several states, when called into the actual service of the United States."

Amendment 5: "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service, in time of war or public danger."

The distinction between the National Army and state militia is pointed out by Attorney General Wickersham, in his opinion of February 17, 1912 (29 Op. Attys. Gen. 322), in which he said:

"When the Constitution gives to Congress the power 'to raise and support armies,' and 'to provide for calling of the militia to execute the laws of the Union, * * *' and makes the 'President the commander-in-chief of the army and navy of the United States, and of the militia of the several states, when called into actual service of the United States,' it is speaking of two different bodies—the one the Regular Army, in the continuous service of the government, and liable to be called into actual service at any time, or in any place where an armed force is required; and the other a body for domestic service, and liable to be called into the service of the government only upon the particular occasions named in the Constitution."

It is not contended that power to draft an army is expressly withheld, but that it is not expressly conferred. The liability of all inhabitants of the United States to be drafted into military service in time of war, it appears, cannot be questioned. It results from the sovereignty of the nation, and the power conferred upon Congress must carry with it the necessary means of carrying out the power. The validity of the draft acts of the Civil War in the North and the South was contested in the courts and sustained.[1]

Nowhere in the Constitution is there a limitation as to the means by which Congress shall raise an army, and, guided by the history of the times, the draft method of raising an army was not foreign to the Constitution makers or the "fathers of our country." The General Assembly of Virginia in May, 1777, passed a conscription act which had been drafted by Thomas Jefferson. Writings of Thomas Jefferson, vol. 2, page 123 (Ford's edition). In 1777 New York adopted a Constitution which declared:

"It is the duty of every man who enjoys the protection of society to be prepared, and willing, to defend it."

The Continental Congress, of February 26, 1778:

"Resolved, that the several states hereafter named are required forthwith to fill up by drafts from their militia, or any other way that may be effectual, their respective battalions of continental troops, according to the following arrangement, viz. [naming 11 states]. * * * That all persons drafted shall serve in the continental battalions * * * for the space of nine months; * * * and

"Resolved, that no prisoners of war or deserters from any alien army be enlisted, drafted, or returned to serve in the continental army."
2 Journals of Congress, 458–495.

At the session of August 31, 1778, appears the following:

"Letters of the 27th, from the Committee on Arrangements, that camp was ready, informing that a great spirit of enlistment had taken place among the soldiers who were brought into the army as drafts. * * *" 3 Journals of Congress, 38: 45 Wash. Law Rep. No. 25, June 22, 1917.

On November 15, 1777, delegates of the United States of America did agree to certain articles of confederation. These were approved by Congress July 9, 1778, and signed on behalf of nearly all the states during that year; the last to sign being Maryland, March 1, 1781. On September 17, 1787, by unanimous consent all states present adopted the Constitution. 1 U. S. Stat. at Large, 1–20. Into the very fabric of the Constitution of the United States was woven the sentiment of draft with relation to armies, and, no intimation against draft being expressed in the Constitution, the power is as plainly implied as though expressly given.

[1] McCall's Case, 5 Phila. 268, Fed. Cas. No. 8,669; Kneedler v. Lane, 45 Pa. 238; In re Spangler, 11 Mich. 298; In re Griner, 16 Wis. 423; Jeffers v. Fair, 33 Ga. 347; Barber v. Irwin, 34 Ga. 29; Ex parte Hill, 38 Ala. 429; Burroughs v. Peyton, 57 Va. 470; Lanahan v. Birge, 30 Conn. 438; Ex parte Coupland, 26 Tex. 386; Druecker v. Salomon, 21 Wis. 621, 94 Am. Dec. 571; Allen v. Colby, 47 N. H. 544; Parker v. Kaughman, 34 Ga. 136; Ex parte Bolling, 39 Ala. 609.

Chief Justice Marshall, in McCulloch v. State, 4 Wheat. 406, at page 421 (4 L. Ed. 579), in discussing the power of incorporating a Bank of the United States (Act April 10, 1816, c. 44, 3 Stat. 266), said:

"Among the enumerated powers, we do not find that of establishing a bank or creating a corporation, but there is no phrase in the instrument which, like the Articles of Confederation, excludes incidental or implied powers and which requires that everything granted shall be expressly and minutely described."

At page 407 of 4 Wheat. (4 L. Ed. 579), he said:

"The Constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind."

And again, on the same page:

"It is also in some degree warranted by their having omitted to use any restricted term which might prevent its receiving a fair and just interpretation."

Again:

"But it may, with great reason, be contended that a government, intrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be intrusted with ample means for their execution. The power being given, it is to the interest of the nation to facilitate its execution. It can never be their interest, and cannot be presumed to have been their intention, to clog and embarrass its execution by withholding the most appropriate means.

At page 409 of 4 Wheat. (4 L. Ed. 579), he said:

"*The government which has a right to do an act, and has imposed on it the duty of performing that act, must, according to the dictates of reason, be allowed to select the means; and those who contend that it may not select any appropriate means, that one particular mode of effecting the object is excepted, take upon themselves the burden of establishing that exception.*" (Italics are ours.)

All that was said in that case can with equal force and propriety be applied to the instant case. Mr. Justice Field, in Tarble's Case, 13 Wall. 397–408, 20 L. Ed. 597, said:

"The execution of these powers falls within the line of its duties; and its control over the subject is plenary and exclusive. It can determine, without question from any state authority, how the armies shall be raised, whether by voluntary enlistment or forced draft, the age at which the soldier shall be received, * * * the compensation he shall be allowed, and the service to which he shall be assigned."

In Jacobson v. Massachusetts, 197 U. S. 11, at page 29, 25 Sup. Ct. 358, at page 362 (49 L. Ed. 643, 3 Ann. Cas. 765), the court, in discussing the freedom or restraint of the individual on the part of the government, said:

"He may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense. Is it not, therefore, true that the power of the public to guard itself against imminent danger depends in every case involving the control of one's body upon his willingness to submit to reasonable regulations established by the constituted authorities

under the sanction of the state, for the purpose of protecting the public collectively against such danger?"

Nor can the Thirteenth Amendment give to the defendants any consolation. The defendants have called our attention to the Slaughterhouse Cases, 16 Wall. 36, 21 L. Ed. 394, and quote from the opinion as follows:

"That a personal servitude was meant is proved by the use of the word 'involuntary,' which can only apply to human beings. The exception of servitude as a punishment for crime gives an idea of the class of servitude that is meant. The word 'servitude' is of larger meaning than 'slavery.'"

On page 72 of 16 Wall. (21 L. Ed. 394) Mr. Justice Miller said:

"But what we do say, and what we wish to be understood, is that in any fair and just construction of any section or phrase of these amendments it is necessary to look to the purpose which we have said was the pervading spirit of them all, the evil which they were designed to remedy, and the process of continued addition to the Constitution, until that purpose was supposed to be accomplished, as far as constitutional law can accomplish it."

The Supreme Court, in Butler v. Perry, 240 U. S. 328, 36 Sup. Ct. 258, 60 L. Ed. 672, in passing upon the validity of an amendment to a state law requiring able-bodied male persons between certain ages, resident in the state for a fixed time, to work on the roads and bridges a prescribed time each year, said:

"This amendment was adopted with reference to conditions existing since the foundation of our government, and the term 'involuntary servitude' was intended to cover those forms of compulsory labor akin to African slavery, which in practical operation would tend to produce like undesirable results. It introduced no novel doctrine with respect to services always treated as exceptional, and certainly was not intended to interdict the enforcement of those duties which individuals owe to the state, such as services in the army, militia, on the jury, etc. The great purpose in view was liberty under the protection of effective government, and not the destruction of the latter by depriving it of the essential powers."

[4] Nor are the defendants deprived of any rights granted by the Fifth Amendment. In Taylor v. Kercheval (C. C.) 82 Fed. 499, the court said:

" * * * And it is clear that complainant has in no just sense a property right in his office or employment. * * *"

[5] Nor does the Selective Service Act delegate legislative power to the President. It merely grants power to regulate the execution of the law, and is therefore not open to attack. In re Kollock, 165 U. S. 526, 17 Sup. Ct. 444, 41 L. Ed. 813. The Circuit Court of Appeals of the Second Circuit, in Angelus v. Sullivan et al., 246 Fed. 54, 158 C. C. A. 280, sustained the constitutionality of the Selective Service Act.

What has been said disposes of all contentions raised, and an order may be taken overruling the demurrers.